**Jesse HIGGINS et al., Appellants,**

v.

**Ray MARSHALL, Sec. of Labor, et al.**

**No. 77–1829.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 22, 1978.

Decided July 25, 1978.

Rehearing Denied Sept. 22, 1978.

J. Skelly Wright, Chief Judge, filed a dissenting opinion.

Steven B. Jacobson, Washington, D. C., for appellants.

John S. Lopatto, III, Atty., Dept. of Labor, Washington, D. C., for appellee, Secretary of Labor.

Mark M. Pierce, of the bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of Court, with whom William Roundtree, Cocoa, Fla., was on the brief, for appellee, Old Ben Coal Co.

Before WRIGHT, Chief Judge, SWYGERT,* United States Circuit Judge for the Seventh Circuit, and ROBB, Circuit Judge.

Opinion for the Court filed by SWYGERT, Circuit Judge.

Dissenting opinion filed by J. SKELLY WRIGHT, Chief Judge.

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

SWYGERT, Circuit Judge:

The issue in this appeal is one of statutory interpretation. Pursuant to section 203 of Title II of the Federal Coal Mines Health and Safety Act of 1969 (the 1969 Act), "[a]ny miner [who contracts pneumoconiosis and opts to transfer to a position in a less dusty area of the mine] shall receive compensation for such work at not less than the *regular rate of pay* received by him immediately prior to his transfer." 30 U.S.C. § 843(b)(3) (emphasis added). What the "regular rate of pay" means is the question we must decide.

I

During 1972 each of the plaintiffs-appellants, three coal miners for Old Ben Coal Company (Old Ben) in Franklin County, Illinois, had chest examinations which showed evidence of the development of pneumoconiosis or black lung disease. Each man thereby became eligible for transfer to another position in a less dusty area of the mine to prevent further development of the disease. 30 U.S.C. § 843(b)(1). Plaintiffs Jesse Higgins and Paul Gower transferred from positions as machine operators to positions as tracklayers; plaintiff William Gipson transferred from a position as a repairman to one as a bottom laborer. Before the transfer, each man received $41.50 a day; after the transfer each man continued to receive $41.50 a day although the other miners in the new positions received only $37.25 a day.

On November 12, 1972 the situation changed. Pursuant to a new wage agreement, as of that date the daily wage rates for the positions vacated by plaintiffs were raised to $45.75 while the rates for the new positions were raised to $40.00. The plaintiffs continued to received $41.50 a day, the old rate applicable to their former positions. This meant that the miners were receiving $4.25 less each day than they would have received had they never transferred from their previous positions. They were, however, receiving $1.50 more each day than other miners in the new positions. One year later, when $50.00 became the daily rate for the vacated positions and $42.75 for the new ones, the plaintiffs began to receive $42.75 and have continued to receive the annual increases awarded to miners in their new positions.[1] The plaintiffs unsuccessfully requested payment from Old Ben at the rate for their vacated positions.

In a complaint first filed with the Department of the Interior[2] and then refiled with the Department of Labor, the plaintiffs alleged that Old Ben was discriminating against them in violation of 30 U.S.C. §§ 820(b) and 938(a) by not paying the "Standard Daily Wage Rate" for their pretransfer positions as required under section 843(b)(3), that is, by not granting them the pay increases they would have received had they not transferred. A Department of Labor administrative law judge denied relief, holding that Old Ben had not violated section 843(b)(3). The judge rejected the expansive construction suggested by the plaintiffs and instead read the section as a "rather clear statement that a miner who chooses to transfer shall not be paid at a lesser rate (dollars per hour or day or ton) than he was receiving *immediately* prior to his transfer." (emphasis in the order) He found that the term "immediately prior" fixes the minimum hourly or daily rate which may be paid, not the classification rate. The judge noted that although the more liberal construction would probably

1. The applicable daily wage rate and the amounts actually paid to the miners are summarized as follows:

| Dates | Machine Operator/Repairman | Tracklayer/Bottom Laborer | Amount Paid | Difference |
|---|---|---|---|---|
| Transfer to 11/11/72 | $41.50 | $37.25 | $41 50 | .. |
| 11/12/72 to 11/11/73 | $45.75 | $40.00 | $41 50 | $4.25/day |
| 11/12/73 to 11/11/74 | $50.00 | $42.75 | $42.75 | $7 25/day |
| 12/06/74 to 12/05/75 | $55.00 | $47.03 | $47.03 | $7.97·day |
| 12/06/75 to 12/05/76 | $57.20 | $48.91 | $48.91 | $8 29/day |
| 12/06/76 to 12/05/77 | $58.92 | $50.38 | $50.38 | $8.54/day |

2. On July 16, 1974 the Interior Board of Mine Operations Appeals denied the miners relief on

encourage more transfers to cleaner environments by not forcing the afflicted miners to choose between wages and health, the absence of ambiguity in the statute's language prevented such a construction. The administrative law judge's order was affirmed in an unreported decision by the district court.

## II

The question is whether the language of section 843(b)(3) (that a miner who chooses to transfer for health reasons may not be compensated at less than the "regular rate of pay" received immediately prior to transfer) means that in addition to not suffering an immediate pay cut, the transferring miner also may not be denied the future pay increments he would have received had he remained in his previous position.

Plaintiffs contend that the term "regular rate of pay" was misinterpreted by both the administrative law judge and the district court. They argued that one who exercises his option to transfer to a cleaner environment must continue to receive at least the wages he would have received had he not transferred, and that the rate of pay is tied to the position rather than to a dollar amount received immediately prior to transfer. The plaintiffs suggest that the term "rate of pay" was misinterpreted because too much importance was attached to the use of the word "immediately" in the statute, and, instead, more attention should have been given to the word "regular." Accordingly, the term "regular rate" would then have been defined as the "classification" rate because a miner would have been receiving the same "classification rate" more regularly than the same "dollar rate."

In the alternative, the plaintiffs argue that the term "regular rate of pay" is latently if not patently ambiguous, and therefore this court must reconstruct how Congress would have decided the issue had it been specifically addressed, citing Judge Leventhal's concurrence in *District 6,*

*UMWA v. IBMA,* 183 U.S.App.D.C. 312, 562 F.2d 1260 (1977). They suggest that the legislative history provides such firm evidence in support of their more liberal construction that this court would be obliged to adopt that construction even if the "plain words" of the statute could support only the more limited interpretation. As their final argument the plaintiffs contend that a canon of statutory construction requires a liberal interpretation of remedial legislation.

Although the two defendants take slightly different approaches in response to the plaintiffs' arguments, they both respond that none of the arguments is viable mainly because the language of the statute is plain and therefore requires no judicial interpretation. We agree.

When faced with a question of statutory interpretation, a court first must look to the language of the act itself. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). In the absence of persuasive reasons to the contrary, we must give the words of an enactment their ordinary meaning. *Banks v. Chicago Grain Trimmers Association,* 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968). With these principles in mind, we find that the language of section 843(b)(3) is simple and straight-forward: a transferring miner is not to receive less compensation than he would have received had he not transferred, that is, not less than the monetary amount he was receiving "immediately prior to transfer." We therefore find it unnecessary to resort either to any additional rule of statutory construction or to the legislative history.

We find no merit in the plaintiffs' contention that the term "rate of pay" is latently if not patently ambiguous. There is no ambiguity and therefore we do not need to reconstruct how Congress would have decided the specific question presented here. The legislative history of the section, albeit sparse, indicates congressional con-

---

jurisdictional grounds. An appeal from that decision was dismissed by this court as untimely filed. *Higgins v. Andrus,* No. 77–1363 (D.C. Cir., June 20, 1977).

cern for protecting the transferring miner from loss in compensation.[3] There is nothing to indicate that Congress meant to tie the compensation protection to the pay rate received by miners in the pre-transfer classification. To so hold would be to distort the clear meaning of the words of the statute. When the meaning is clear, and the enactment is within the constitutional authority of Congress, the "sole function of the courts is to enforce it according to its terms," *Caminetti v. United States,* 242 U.S. at 485, 37 S.Ct. at 194. Our reading of the statute is consistent with the basic purpose of the Act; by not having to take a pay cut upon transfer to a position which would ordinarily pay less, the miner is more likely to transfer to protect his health than he would be otherwise.

Although we did not need to resort to legislative history in light of our holding that the meaning of the phrase "regular rate of pay" is clear and unambiguous, *March v. United States,* 165 U.S.App.D.C. 267, 274, 506 F.2d 1306, 1313 (1974), our research failed to uncover any conflicting history. *Boston Sand and Gravel Company v. United States,* 278 U.S. 41, 48, 49 S.Ct. 52, 73 L.Ed. 170 (1928). We do note one additional argument made by the Secretary of Labor which concerns the legislative history of the amendments to the 1969 Act. On November 9, 1977 Congress enacted the Federal Mine Safety and Health Amendments Act of 1977 (the 1977 Act), amending the 1969 Act by modifying and extending coverage under Titles I and V to all types of mining. Titles II, III, and IV remain

basically unchanged and continue to apply exclusively to the coal mining industry.

The Secretary argues, with persuasion, that because Congress specifically considered the question of whether to adopt the compensation protection provision of section 843(b)(3) when amending Title I, the legislative history of the 1977 Act may be viewed as an indication of how Congress had intended the pay protection provision in Title II to operate. As that legislative history shows, the House version of the bill included no such provision under Title I. The Senate version, on the other hand, incorporated pay protection in Title I as follows:

> Any miner transferred as a result of such exposure [to a hazard covered by a mandatory standard promulgated under this Act] shall continue to receive compensation for such work at not less than the regular rate of pay for miners *in the classification such miner held immediately prior to his transfer.*

S. 717, 95th Cong., 1st Sess. § 201[102(a)(6)] (1977) (emphasis added). This language clearly would have required transferred miners to be compensated indefinitely as they would have been had they never transferred. Neither the House nor Senate version altered the existing language of section 843(b)(3) of Title II.[4]

After passage of the bills, a conference committee met to resolve the differences. The compensation protection provision of Title I, as finally enacted by both houses, includes the following language:

> some mine operators have refused to pay transferees wage increases they would have received if they had remained in their former positions, and administrative relief from this practice has so far been denied. As a result, less than one-fourth of those entitled to transfer have done so.
>
> To solve this problem once and for all, a new section 202(f) should be added to the bill after line 12 on page 66, as follows:
> (e) Section 203(b)(3) [843(b)(3)] of such Act is amended by striking out "received by him" and inserting in lieu thereof "being paid to miners performing the type of work such miner was performing."

Congress did not adopt the proposed change.

---

3. H.R.Legis.Hist. at 49; S.Legis.Hist. at 175.

4. It is also worth noting that the very problem we address here was drawn to the attention of Congress when the House and Senate subcommittees were considering the amendments to the 1969 Act. The following is an excerpt from the statement submitted by Arnold Miller, President of the United Mine Workers, to both subcommittees:

> *Black Lung Transfer Program.* Section 203(b) of the 1969 Coal Act gives miners who have developed simple pneumoconiosis a right to transfer to positions in less dusty areas of mines in order to prevent the advance of their disease, without having to suffer any loss in compensation. However,

Any miner transferred as a result of such exposure shall continue to receive compensation for such work at no less than the regular rate of pay for such miners in the classification such miner held immediately prior to his transfer. *In the event of the transfer of a miner pursuant to the preceding sentence, increases in wages of the transferred miner shall be based upon the new work classification.*

30 U.S.C. § 811(a)(7) (emphasis added). Of particular note is the explanation included in the Conference Report:

The conference substitute conforms to the Senate bill, except that it limits the scope of the provision which guarantees that a miner who is reassigned to a different job classification will suffer no reduction in compensation if such reassignment is the result of a medical examination indicating that such miner may suffer material impairment of health or functional capacity by further exposure to a toxic substance or harmful physical agent. After reassignment, however, such miner will be entitled only to the same dollar rate increases applicable to his new job classification. The conferees intend this provision to encourage miner participation in medical examination programs by insuring that miners who do participate in such programs shall suffer no immediate financial disadvantage if a medical examination results in a job reassignment.

H.Conf.Report No. 95–655, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 3401, 3490.

It is clear that non-coal miners transferred under section 811(a)(7) of the 1977 Act because of exposure to toxic substances are not to suffer any immediate decrease in pay, but it is also manifest that the pay protection is not linked forever to their pre-transfer job classification. Of course, had Congress specifically addressed the issue of the intent of section 843(b)(3) of the 1969 Act, its declaration would clearly have been entitled to great weight. But even in the absence of such express consideration, subsequent enactments are entitled to some weight. At the very least, the legislative history surrounding the enactment of section 811(a)(7) is consonant with our holding.

The judgment of the district court is affirmed.

J. SKELLY WRIGHT, Chief Judge, dissenting:

In Section 2 of the Federal Coal Mine Health and Safety Act of 1969 (FCMHSA or Act) Congress expressly declared that "the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner."[1] Even industry spokesmen testified in the hearings on the 1969 legislation that they did "not believe profits should be put ahead of the health and safety of mineworkers."[2] To assure that the Act's purpose would not be frustrated by subsequent judicial construction, the Conference Report specifically stated that "[i]n adopting these provisions, the managers intend that the act be construed liberally when improved health or safety to miners will result."[3]

The majority today turns its back on Congress' primary concern with the health of miners and adopts an interpretation of the Act that condemns miners suffering from the dread black lung disease (pneumoconiosis)[4] to choose either continued exposure to

1. Federal Coal Mine Health and Safety Act of 1969, § 2(a), 30 U.S.C. § 801(a) (1970).

2. S.Rep.No.91–411, 91st Cong., 1st Sess. 1 (1969) (*quoting* Stephen F. Dunn, President of the National Coal Association).

3. H.R.Rep.No.91–761, 91st Cong., 1st Sess. 63 (1969).

4. The Surgeon General has described this disease as follows:

Coal miners' pneumoconiosis is a chronic chest disease, caused by the accumulation of fine coal dust particles in the human lung. In its advanced form, it leads to severe disability and premature death.

\* \* \* \* \* \*

Physicians classify coal miners' pneumoconiosis as simple or complicated, depending on the degree of evidence in the X-ray picture. \* \* \*

\* \* \* [S]imple pneumoconiosis seldom produces significant ventilatory impairment,

levels of coal dust that will aggravate their affliction or a significant loss in compensation.[5] The majority explains its action by claiming that the statutory provision in question is "clear and unambiguous." Majority op., 190 U.S.App.D.C. at ——, 584 F.2d at 1038. Since I find an interpretation of the statute that would fulfill congressional intent, rather than frustrate it, equally compatible with the statutory language, I must respectfully dissent.

This case turns on language in Section 843(b) of the FCMHSA, a provision designed to allow miners who have been diagnosed as suffering from black lung disease to transfer at their option to mining jobs in which they will be exposed to lower amounts of the coal dust that causes and aggravates their crippling and eventually fatal disease. Realizing that miners might hesitate to transfer voluntarily to jobs with lower wages, Congress provided in Section 843(b)(3) that "[a]ny miner so transferred shall receive compensation for such work at not less than the regular rate of pay received by him immediately prior to his transfer." 30 U.S.C. § 843(b)(3) (1970).

The question in this case is whether the words "regular rate of pay" should be interpreted to mean *dollar* rate or *classification* (job, contract) rate—*i. e.*, whether transferred miners should continue to receive compensation at the same dollar rate of pay (*e. g.*, $40/day) or rather at the same classification rate of pay (*e. g.*, the machine operator's rate, the GS–2 rate) that they received before being transferred. In today's inflationary economy the practical difference between these interpretations is that the classification rate interpretation will allow a stricken miner to transfer to a more healthy environment without fear of sacrificing ever larger percentages of his compensation, while the dollar rate interpretation will grant the miner a "protection" so temporary that it may well be scheduled to disappear even before the current industry contract expires.[6] The impact of this difference is all too clear from statistics on transfers since the FCMHSA was passed. Most employers have, like Old Ben Coal Company, adopted the dollar rate interpretation. As a result, only a fraction of the miners eligible for transfers have taken advantage of the remedy Congress provided.[7]

---

but, the pinpoint type may reduce the diffusing capacity, the ability to transfer oxygen from the lung into the blood.

Complicated penumoconiosis [*sic*] [which results if exposure to coal dust continues after the victim contracts simple pneumoconiosis] is a more serious disease. The patient incurs progressive massive fibrosis as a complex reaction to dust and other factors, which may include tuberculosis and other infections. The disease in this form usually produces marked pulmonary impairment and considerable respiratory disability. Such respiratory disability severely limits the physical capabilities of the individual, can induce death by cardiac failure, and may contribute to other causes of death.

\* \* \* \* \* \*

There is no specific therapy for pneumoconiosis in either its simple or complicated form.

S.Rep.No.94–411, *supra* note 2, at 7–8. The Senate Report also notes that the disease is "irreversible once contracted." *Id.* at 7.

5. The significance of the loss in compensation is evident from the facts of this case. As the figures reproduced in note 2 of the majority opinion indicate, appellant miners were receiving 17% less compensation in 1977 than they would have been receiving had they chosen

continued exposure to coal dust. Those figures also demonstrate that the loss in compensation has steadily *increased* over time, both absolutely and as a percentage of wages paid. The most convincing evidence of the significance of the loss in compensation, however, is the fact that most eligible miners have chosen continued exposure to coal dust rather than accept the lower income that they fear will result from a voluntary transfer. *See* text and notes at notes 7 & 14 *infra*.

6. In this very case appellant miners transferred in 1972, and the "protection" offered them by the mine owners' "dollar rate" interpretation was cancelled out by November 1973 as a result of wage increases that had been agreed to before their transfer, under the National Bituminous Wage Agreement of 1971. *See* JA 7.

The dollar rate interpretation would lead to equally anomalous results if the wages for all positions in the coal mines were dropping, rather than rising. In such a situation the dollar rate interpretation would require that miners be paid *more* if they transfer than if they stay in their former jobs.

7. *Federal Mine Safety and Health Amendments Act of 1977*, Hearings Before the Subcomm. on Labor of the Comm. on Human Resources, U.S.

The Administrative Law Judge (ALJ) below recognized that the dollar rate interpretation urged by the mine owners would place "afflicted miners in the dilemma of choosing between their wages and their health, thus chilling any inclination to opt for their health." JA 9. He also agreed with appellants that "in choosing between two wholly permissible readings of the Act, it would be my duty to accept that reading which fosters the health of miners." *Id.* Nevertheless, he concluded that the "literal language of the Act" was not "open" to the classification rate interpretation. *Id.* at 10. He focused particularly on the word "immediately," asserting that "[i]ts presence can be explained, in my judgment, only as a reference point from which to ascertain the lowest wage rate [a transferred miner] may lawfully be paid." *Id.* at 9. This reliance on the word "immediately" seems misguided: such a "reference point" is equally necessary under either the classification rate or the dollar rate interpretation.[8]

Both the District Court and the majority sustain the ALJ's conclusion that the statute is unambiguous. While both courts wisely avoid relying on the word "immediately," neither supports its conclusion that the language is clear with anything but bald assertions that "regular rate of pay" can mean only *dollar* rate of pay. I find these unsupported assertions singularly unconvincing. The majority never addressed the undisputed fact that the term "rate of pay" is commonly used in the sense of classification rate or job rate, rather than dollar rate.[9] Nor does it answer the argument that a miner's classification rate of pay is

clearly more "regular" than his dollar rate. The majority apparently hopes to eliminate the statute's obvious ambiguity by asserting repeatedly that it does not exist. Despite these efforts, however, even the majority's own explanation of its position falls victim to the ambiguity it stubbornly refuses to acknowledge. The majority first describes the "simple and straightforward" meaning of the statute as follows: "a transferring miner is not to receive less compensation than he would have received had he not transferred * * *." 190 U.S.App.D.C. at ——, 584 F.2d at 1037. This requirement would be satisfied by the classification rate interpretation, but it is clearly not satisfied by the interpretation adopted by the majority. Then, in the same sentence, the majority "clarifies" this "simple and straightforward" meaning by adding the words "that is, not less than the monetary amount he was receiving 'immediately prior to transfer.'" *Id.*

Once such obvious verbal manipulation is put aside and the ambiguity on the face of the statute is honestly acknowledged, a court must turn to the legislative history for assistance in choosing the correct interpretation. As the ALJ was quick to recognize,[10] the legislative history in this case mandates the classification rate interpretation urged by the miners. The Senate Report summarized the intent of Section 843(b)(3) as follows:

> In order to insure that miners who are afflicted with pneumoconiosis suffer no loss in compensation, the committee has included a provision entitling a miner

---

Senate, 95th Cong., 1st Sess. 162 (1977) (prepared statement of Arnold R. Miller). *See also* note 14 *infra.*

**8.** When the Senate wrote an analogous, but less ambiguous, provision in 1977 which clearly specified protection of compensation based on a miner's "classification rate," it again used the words "immediately prior to his transfer" as a reference point. *See* text and note at note 18 *infra.*

**9.** The term "rate" is used in the sense of classification rate in both the brief of appellee Old Ben Coal Co. at p. 15 and the majority's opinion, *e. g.*, 190 U.S.App.D.C. at ——, 584 F.2d at

1036–1037. Appellee Secretary of Labor (brief at 7) urges the court to consider the meaning of the terms "regular rate of pay" in another section of the Act, which guarantees miners full compensation at their regular rates of pay if a mine is closed for safety violations. 30 U.S.C.A. § 821 (1978 pocket part). As appellants point out, however, the classification rate interpretation fits in § 821 as well as, if not better than, the dollar rate interpretation. Appellants' reply brief at 22–25.

**10.** *See* 190 U.S.App.D.C. at ——, 584 F.2d at 1036, *supra*; JA 9.

who is transferred to another job pursuant to this subsection to receive his old or new rate of pay, whichever is greater.[11]

The classification rate interpretation—that if a miner transfers from being a machine operator to being a repairman his "old rate of pay" is the rate for machine operators and his "new rate" is the rate for repairmen—is not only a logical interpretation, but the only one that will not frustrate Congress' intent to prevent transfers from resulting in "loss in compensation."

Even more conclusive is Congress' express direction that "the Act be construed liberally when improved health or safety to miners will result."[12] As this court has recently stated, "Should a conflict develop between a statutory interpretation that would promote safety [or health] and an interpretation that would serve another purpose at a possible compromise to safety [or health], the first should be preferred." *District 6, UMW v. U.S. Dep't of Interior Board of Mine Operations Appeals*, 183 U.S. App.D.C. 312, 317, 562 F.2d 1260, 1265 (1977). The health consequences of the alternative interpretations urged by the parties in this case are undisputed. The ALJ's observation that the dollar rate interpretation would "chill" the miners' "inclination to opt for their health"[13] is overwhelmingly confirmed by experience. With most mine owners following the dollar rate interpretation, less than 20 percent of the eligible miners have taken advantage of the option to transfer to more healthy job environ-

ments.[14] The majority's decision today can only further reduce the incentive to opt for health: it undermines the compensation protection Congress sought to provide and assures that Congress' intent to arrest the development of already diagnosed black lung disease will continue to be frustrated.

In an attempt to buttress its reliance on the allegedly "clear" words of the statute the majority makes some reference to the legislative history of the Federal Mine Safety and Health Amendments of 1977. These amendments extended the enforcement provisions set out in Titles I and V of the FCMHSA to other (non-coal) parts of the mining industry and shifted responsibility for enforcing the entire Act from the Interior Department to the Labor Department.[15] As the majority points out, the 1977 amendments did not attempt to address in any detail problems that had arisen under Titles II (which contains Section 843(b)(3)), III, and IV of the Act, which remained applicable only to coal mining.[16] Thus, although the United Mine Workers did comment on the problem of the ambiguity in Section 843(b)(3) in hearings on the 1977 legislation in the hope that Congress would resolve the issue, Congress' failure to address this issue, which was peripheral to its central concerns, is certainly not an endorsement of either position in this case.[17]

The majority also mentions the transfer provision enacted in the 1977 amendments to cover non-coal miners—a provision analo-

---

11. S.Rep.No.94–114, *supra* note 2, at 49. This same language was used in the debates following the Conference to describe the legislation as it emerged from the Conference Committee. *See* Staff of Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 94th Cong., 1st Sess., Legislative History of the Federal Coal Mine Health and Safety Act of 1969 at 1607 (Committee Print 1975).

12. H.R.Rep.No.91–761, *supra* note 3, at 63.

13. *See* 190 U.S.App.D.C. at ——, 584 F.2d at 1036, *supra*; JA 9.

14. The most recent figures cited by the parties indicate that between the effective date of the 1969 Act, June 30, 1970, and December 31, 1975, 5,815 miners had been found eligible for black lung transfers. Yet only 1,150 (19.6%) of

these eligible miners had exercised their rights to transfer and only 435 (7.5%) were still in their new positions at the end of 1975. Department of the Interior, Mining Enforcement Safety Administration, 1975 Annual Report and Achievements Part I at 11 (1976), cited in appellants' brief at 12.

15. *See* H.R.Rep.No.95–655, 95th Cong., 1st Sess. 37 (1977).

16. *Id.*; majority op., 190 U.S.App.D.C. at ——, 584 F.2d at 1038.

17. At the time the UMW made its presentation to Congress there was apparently no definitive administrative interpretation on this point. *See* appellants' reply brief at 37.

gous to Section 843(b)(3). Insofar as the legislative history of this provision is relevant at all to the case before us, however, it seems to support appellants rather than the majority. As the majority notes, the 1977 transfer provision as originally passed by the Senate contained language specifically providing that transferred miners were to continue to be paid at their old *classification* rate:

> Any miner transferred as a result of such exposure shall continue to receive compensation for such work at not less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer.

S. 717, 95th Cong., 1st Sess. § 201 (1977). The Senate thus adopted new, clearer language rather than repeating the ambiguous language of Section 843(b)(3). The Senate Report pointed out specifically that the " 'regular rate' is to include any subsequent salary increase received by miners in the classification such miners held immediately prior to transfer." S.Rep.No.95–181, 95th Cong., 1st Sess. (1977).

The House bill, on the other hand, contained no transfer provision, and the House conferees were apparently unwilling to extend to non-coal miners the full protection provided by the Senate bill. The compromise version of the transfer provision that emerged from the Conference Committee therefore added a sentence expressly limiting the protection offered by the Senate bill: any *increases* in a transferred miner's wages were to be governed by his new, rather than his old, classification.[18]

Both the language of the 1977 transfer provision as eventually enacted and the Conference Report reflect Congress' awareness that it was placing a special limit on the protection offered to transferring miners. Rather than adopting the Senate version, which it described as providing for "no reduction in compensation," the Conference adopted a version it described as providing that transferred miners would "suffer no *immediate* disadvantage." H.R.Rep.No.95–655, 95th Cong., 1st Sess. 42 (1977) (emphasis added). This explicit recognition of the limitation on the protection provided in the 1977 statute contrasts sharply with the ambiguous wording of Section 843(b)(3) and the unqualified statement in its legislative history that transferred coal miners were to suffer "no loss in compensation." [19]

Although the absence of specific limitations on the wage protection offered by Section 843(b)(3) can be used to support appellants' position when viewed in comparison with the analogous 1977 transfer provision, arguments for either side based on the 1977 legislation suffer serious limitations: eight years had passed and a different Congress was involved, the 1977 transfer provision covers different miners with different afflictions[20] and is mandatory rather than voluntary, and, perhaps most important, the 1977 provision is clearly a compromise which lies between the positions urged by appellants and appellees and which no one here urges as a possible interpretation of the language of Section 843(b)(3).

Under these circumstances, the most fruitful approach to this case is to focus on the words of Section 843(b)(3), recognize

---

18. Any miner transferred as a result of such exposure shall continue to receive compensation for such work at no less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer. *In the event of the transfer of a miner pursuant to the preceding sentence, increases in wages of the transferred miner shall be based under the new work classification.* * * *

30 U.S.C.A. § 811(a)(7) (1978 pocket part) (emphasis added).

19. *See* text and note at note 11 *supra.*

20. The 1977 amendments require transfers "where a determination is made that a miner may suffer material impairment of health or functional capacity by reason of exposure to the hazard covered by [a] mandatory standard * * *." Section 101(a)(7), 30 U.S.C.A. § 811(a)(7). Rather than dealing with a specific disease like black lung and with figures that could be accurately approximated, Congress in 1977 was legislating with respect to a much more vaguely defined and potentially expansive category of disabilities. This difference might arguably have been responsible for the legislature's reluctance to grant full wage protection.

their ambiguity, and interpret them according to the clear intent and explicit directions of Congress. Since the majority cuts its inquiry short by clinging to the claim that the Congress, despite its expressed intentions, enacted a provision that "clearly and unambiguously" offers only a phantom protection to the mining industry's "most precious resource" and puts profits ahead of the health and safety of mine workers, I respectfully dissent.