John MATALA, Appellee,

v.

CONSOLIDATION COAL COMPANY,
Appellant,

and

Ray Marshall, Secretary of
Labor, Defendant.

John MATALA, Appellee,

v.

Ray MARSHALL, Secretary of
Labor, Appellant,

and

Consolidation Coal Company, Defendant.

Nos. 80–1287, 80–1288.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 7, 1981.

Decided April 24, 1981.

Rehearing and Rehearing En Banc Denied
July 21, 1981.

Belva D. Newsome, U. S. Dept. of Labor, Washington, D. C. (Carin Ann Clauss, Sol. of Labor, Laurie M. Streeter, Associate Sol., Judith E. Wolf, Co-Counsel, Washington, D. C., for Black Lung Benefits on brief), for appellant Secretary of Labor.

John H. Riordan, Jr., Pittsburgh, Pa. (Anthony J. Polito, Leonard Fornella, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., on brief), for appellant Consolidation Coal Co.

Steven B. Jacobson, Los Angeles, Cal. (De Castro, West & Chodorow, Los Angeles, Cal., James M. Haviland, Washington, D. C., and McIntyre, Haviland & Jordan, Charleston, W. Va., Harrison Combs, General Counsel, Mary Lu Jordan, United Mine Workers of America, Washington, D. C., on brief), for appellee.

Before BUTZNER, SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Matala is an underground coal employee at Consolidation Coal Company's (Consolidation) Blacksville No. 2 mine in Monongalia County, West Virginia. Prior to March 1, 1975, Matala was employed as a continuous mine operator. On or about March 1, 1975, he was diagnosed as having symptoms of pneumoconiosis (black lung). He thus exercised his right granted by section 203(b)(2) of title II of the Federal Coal Mine Health & Safety Act of 1969 (the Act) [1] to transfer to a less dusty area of the mine. Any miner who exercises his option to transfer is guaranteed by section 203(b)(3) compensation for his new work "at not less than the regular rate of pay received by him immediately prior to his transfer." 30 U.S.C. § 843(b)(3).

After his transfer, Matala was classified as a general inside laborer, a classification having a lower daily base rate than that of his old classification as a continuous mine operator. Matala, however, was paid the same daily base rate after his transfer that he received immediately prior to his transfer. He also received periodic cost of living increases granted to all coal miners.

In a complaint filed with the Department of Labor pursuant to 30 U.S.C. § 938,[2] Matala contended that after he transferred, he was entitled under section 203(b)(3) not only to the same daily base pay that he received in his prior job classification, but also to all wage increases subsequently granted to miners classified as continuous mine operators during the term of the wage agreement that sets the pay scales for each job classification.[3] He claimed that Consolidation discriminated against him in violation of 30 U.S.C. § 938(a) when it failed to grant him such increases.[4]

| From | To | Amount |
|---|---|---|
| Transfer | April 30, 1975 | .07/hr. |
| May 1, 1975 | July 31, 1975 | .15/hr. |
| Aug. 1, 1975 | Oct. 31, 1975 | .22/hr. |
| Nov. 1, 1975 | Jan. 31, 1976 | .29/hr. |
| Feb. 1, 1976 | April 30, 1976 | .36/hr. |
| May 1, 1976 | July 31, 1976 | .39/hr. |
| Aug. 1, 1976 | Oct. 31, 1976 | .46/hr. |
| Nov. 1, 1976 | Dec. 5, 1976 | .52/hr. |
| Dec. 6, 1976 | Jan. 31, 1977 | .00/hr. |
| Feb. 1, 1977 | April 30, 1977 | .04/hr. |
| May 1, 1977 | July 31, 1977 | .14/hr. |
| Aug. 1, 1977 | Oct. 31, 1977 | .23/hr. |
| Nov. 1, 1977 | Dec. 5, 1977 | .28/hr. |

1. Section 203(b)(2) provides in relevant part: [A]ny miner who ... shows evidence of the development of pneumoconiosis shall be afforded the option of transferring from his position to another position in any area of the mine ... where the concentration of respirable dust in the mine atmosphere is not more than 1.0 milligrams of dust per cubic meter of air. 30 U.S.C. § 843(b)(2).

2. This section prohibits an operator from discriminating against "any miner employed by him by reason of the fact that such miner is suffering from pneumoconiosis." 30 U.S.C. § 938(a). It sets forth the procedure for a miner to follow if he believes that discrimination has occurred. 30 U.S.C. § 938(b).

3. At the time of Matala's transfer, the National Bituminous Coal Wage Agreement of 1974 governed the hours, wages, job classifications, and other working conditions of the workers at Consolidation's Blacksville No. 2 mine. This agreement expired on December 5, 1977. Pursuant to the 1974 agreement, and immediately prior to his transfer, Matala was receiving a base wage of $55.00 per day plus a $.07 per hour cost of living adjustment. From the date of his transfer to the date that the agreement expired, Matala received the following non-cumulative add-on cost of living adjustments:

4. The amount paid to Matala compared to that received by continuous coal operators may be summarized as follows:

| Dates | Continuous Coal Operator/Day | Amt. Received By Matala/Day | Loss Due To Transfer/Day |
|---|---|---|---|
| Transfer to 4/30/75 | 55.56 | 55.56 | 0 |
| 5/1/75 to 7/31/75 | 56.20 | 56.20 | 0 |
| 8/1/75 to 10/31/75 | 56.76 | 56.76 | 0 |
| 11/1/75 to 12/5/75 | 57.32 | 57.32 | 0 |

The Secretary of Labor (Secretary) interpreted "regular rate of pay" in section 203(b)(3) to mean the dollar amount that Matala received immediately prior to transferring. The Secretary found that Matala's employer, Consolidation, had paid Matala the same amount after his transfer that he had received immediately prior to transferring. He concluded that Consolidation had not discriminated against Matala by reason of his having been diagnosed as having pneumoconiosis. Thus, Matala's complaint was dismissed.

Matala then filed a petition in district court for review of the Secretary's order. The district court concluded that the Secretary's interpretation of section 203(b)(3) was erroneous. It, therefore, granted Matala's motion for summary judgment against the Secretary and Consolidation, reversing the decision of the Secretary. Both the Secretary and Consolidation appeal the district court's decision. We reverse.

## I.

■ In this case we must decide whether section 203(b)(3) of the Act guarantees the transferred miner only the amount that he received immediately prior to his transfer or whether it requires the employer to continue to pay a transferred employee at his pre-transfer classification rate. If we adopt this latter construction, a transferred employee would continue to receive any pay increases granted to those in his pre-transfer classification subsequent to his transfer.

■ When we are faced with a question of statutory interpretation, our starting point for discerning congressional intent is the language of the statute itself. *State Water Control Board v. Train*, 559 F.2d 921,

924–25 n.20 (4th Cir. 1977). Congress is presumed to have used words according to their ordinary meaning unless a different use is clearly indicated. *United States v. Snider*, 502 F.2d 645 (4th Cir. 1974). In examining section 203(b)(3), we find the language contained therein to be unambiguous. *Accord, Higgins v. Marshall*, 584 F.2d 1035 (D.C.Cir.1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979). The meaning of section 203(b)(3) is clear on its face; it provides that a miner *who transfers because of pneumoconiosis* "shall receive compensation for such work at not less than the *regular rate of pay received by him immediately prior to his transfer.*" (emphasis added). The ordinary meaning of "rate" is dollar amount. *See Higgins v. Marshall*, 584 F.2d 1035 (D.C.Cir. 1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979). Furthermore, "regular rate of pay" must not be read alone but must be construed with the rest of section 203(b)(3). *See United States v. Snider*, 502 F.2d 645, 652 (4th Cir. 1974). In the statutory context of section 203(b)(3), the plain meaning of "rate" is confirmed by the modifying phrase "received by him immediately prior to his transfer." If "rate" were construed as referring to classification rate, then "received by him" would have no meaning, thereby violating a basic canon of statutory construction that all words in a statute are to be given effect. *Id.*

Matala has urged upon us a construction that is at odds with the plain meaning of section 203(b)(3). He contends that "regular rate of pay" means the classification rate. In support of his position, he cites two passages in the legislative history. He first asserts that the conferees intended

| Dates | Continuous Coal Operator/Day | Amt. Received By Matala/Day | Loss Due To Transfer/Day |
|---|---|---|---|
| 12/6/75 to 1/31/76 | 59.52 | 57.32 | 2.20 |
| 2/1/76 to 4/30/76 | 60.08 | 57.88 | 2.20 |
| 5/1/76 to 7/31/76 | 60.32 | 58.12 | 2.20 |
| 8/1/76 to 10/31/76 | 60.88 | 58.68 | 2.20 |
| 11/1/76 to 12/5/76 | 61.36 | 59.16 | 2.20 |

| Dates | Continuous Coal Operator/Day | Amt. Received By Matala/Day | Loss Due To Transfer/Day |
|---|---|---|---|
| 12/6/76 to 1/31/77 | 63.08 | 55.00 | 8.08 |
| 2/1/77 to 4/30/77 | 63.40 | 55.32 | 8.08 |
| 5/1/77 to 7/31/77 | 64.20 | 56.12 | 8.08 |
| 8/1/77 to 10/31/77 | 64.92 | 56.84 | 8.08 |
| 11/1/77 to 12/6/77 | 65.32 | 57.24 | 8.08 |

that the Act be construed liberally when improved health or safety to miners will result. H.R.Rep.No.761, 91st Cong., 1st Sess. 63 (1969), U.S.Code Cong. & Admin. News 1969, p. 2503. He also argues that our interpretation is contrary to Congress' intent that those who transfer should "suffer no loss in compensation." S.Rep.No.411, 91st Cong., 1st Sess. 50 (1969). Matala contends that if "regular rate of pay" is interpreted to mean merely dollar amount, then, although the miner who transfers may not necessarily suffer any loss at the moment of transfer, he may suffer substantial losses shortly after transferring if those persons in his pre-transfer classification are granted subsequent increases.[5]

■ While we sympathize with Matala's position, we do not agree with it. The plain meaning of a statute should be rejected only if there is substantial, unambiguous evidence supporting a contrary interpretation. *State Water Control Board v. Train,* 559 F.2d 921, 924–25 n.20 (4th Cir. 1977). We find Matala's references to the legislative history to be very general, and we are not persuaded that the broad passages he cites should be deemed to support clearly and conclusively a contrary interpretation. Our plain meaning construction does not do violence to the intent of Congress that a miner transferring because of black lung should not lose money because of his transfer. Under our interpretation a miner who

exercises his statutory right of transfer would receive the same dollar amount that he received immediately prior to his transfer, thus suffering no loss of pay upon transfer.

■ It appears that Matala has sought to create an ambiguity in section 203(b)(3) by his citations to the legislative history. We look to the legislative history in construing a statute only if the meaning of a statute is unclear. *See United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961). The legislative history should never be used to create doubt if the language of a statute is plain on its face. *Railroad Commission of Wisconsin v. Chicago, Burlington and Quincy Railroad Co.,* 257 U.S. 563, 589, 42 S.Ct. 232, 237, 66 L.Ed. 371 (1922). Because we find the language of section 203(b)(3) to be clear and unambiguous, we find no need to resort to the legislative history.[6]

We hold that, after transferring, Matala was entitled to receive no less than the dollar amount that he received immediately prior to his transfer. Thus, because Matala received $55.00 per day plus a $.07 per hour cost-of-living add-on prior to his transfer, he was entitled to receive no less than $55.00 per day plus $.07 per hour after his transfer.[7] Accordingly, we reverse the judgment of the district court and remand this case to the district court for entry of an order consistent with this opinion.

*REVERSED AND REMANDED.*

---

5. *See* note 4, *supra.*

6. Even if we were permitted to look to the legislative history, we find nothing contained therein that would resolve the alleged ambiguity. Certainly there is evidence that section 203(b)(3) should be construed broadly, but there is no evidence that Congress intended "regular rate of pay" to mean classification rate. In fact, Congress had the opportunity to change section 203(b)(3), if it so desired, to comport with the meaning that Matala contends is proper. When Congress was amending various titles of the Act in 1977, Arnold Miller, President of the United Mine Workers of America, submitted a prepared statement to both the Senate and House subcommittees, advising them that coal mine operators were interpreting section 203(b)(3) as requiring them to pay transferring miners only the dollar amount that they received immediately prior to

transferring. Miller suggested that the wording of section 203(b)(3) be changed to make it clear that Congress intended for the transferring miners to continue to receive any increases they would have received had they remained in their former position. Congress did not adopt Miller's suggestions in 1977 when it made major changes in titles I and V of the Act, and minor amendments to title II (which includes section 203(b)(3)), III, and IV.

7. It appears that from December 6, 1976 to January 31, 1977, Matala was paid only $55.00 per day and that from February 1, 1977 to April 30, 1977, he was paid only $55.00 per day plus $.04 per hour. *See* note 3, *supra.* Because his pay during these two periods was less than the $55.00 per day plus $.07 per hour that he received immediately prior to his transfer, he is entitled to back pay for these two periods.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent.

The linchpin of the majority decision is that the language of section 203(b)(3) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 843(b)(3), is not susceptible to judicial interpretation because it is not ambiguous. In the majority's view, the phraseology "not less than the regular rate of pay received by him immediately prior to his transfer" clearly means the amount of money received by the miner prior to his transfer rather than the regular contract classification rate which fixes the amount of money a miner is to receive from time to time. I think coal miners will be startled to discover this to be the plain meaning of this hoary provision of countless collective bargaining agreements. Their expectation, I submit, would be to the contrary—that the plain meaning of that phrase is the classification rate in which, of course, a miner in a given job classification receives incremental wage increases from time to time. Congress, of course, is no more privy than judges to the discrete vernacular of every industrial subculture. In divining its intent, however, we cannot assume it lacks the linguistic creativity to utilize language familiar to the governed. Since my colleagues, and others equally sincere and sensible, find a directly contrary unambiguous meaning, there are at least conflicting notions as to the plain meaning of this language. This, of course, requires resort to other statutory interpretative aids.

The parties argue the significance of wording in the 1977 amendments to the 1969 Act (which mandate similar transfer rights in non-coal mining industries). The original Senate version of the amendment provided:

Any miner transferred as a result of such exposure shall continue to receive compensation for such work at not less than the regular rate of pay for miners in the classification such miner held immediately prior to his transfer.

S. 717, 95th Cong., 1st Sess. § 201 (1977). The Senate Report made it clear that after transfer the miner would receive the subsequent pay increases of his former classification rate. S.Rep.No.95–181, 95th Cong., 1st Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 3401. The House disagreed and added a specific limitation which appears in the final enactment. Thus the final language provides: "In the event of the transfer of a miner pursuant to [this section], increases in wages of the transferred miner shall be based under the new work classification." 30 U.S.C. § 811(a)(7). The Conference Report indicates that the only protection provided for transferred miners in non-coal mines is protection from immediate economic disadvantage. H.R. Rep.No.95–655, 95th Cong., 1st Sess. 42 (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 3401, 3485. The appellees contend that the inclusion of this specific limitation in the 1977 amendments for non-coal miners is a strong indication that Congress did not intend such a limitation to apply when it previously passed the 1969 Act which, of course, pertains to coal miners only.

The appellants point out, on the other hand, that Congress was solicited by the United Mine Workers to amend the language relating to coal miner transfers to specifically require that a transferred miner's wages be increased according to his old classification. Congress declined to take that action and appellants argue this indicates an original intent that wages be increased according to the miner's new classification. *See* majority opinion at 430, n. 6.

In my view, neither argument is persuasive. Such conjecture is of little efficacy in determining congressional intent. Section 203(b)(3) was enacted in 1969. The amendments containing the transfer provisions for non-coal miners were enacted in 1977. It was then—when the 1977 amendments were under consideration—that the United Mine Workers asked the congressional committee to amend the coal miner transfer provisions. To state the obvious, the composition of Congress in 1977 varied considerably from that of 1969; the intent of the one political body provides little guidance as to the intent of the other.

I am persuaded, however, as was Judge Wright in his dissent in *Higgins v. Marshall*, 584 F.2d 1035 (D.C.Cir.1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979), that Congress telegraphed the intent of the involved language in section 2 of the 1969 Act, 30 U.S.C. § 801(a). In section 2, Congress declared that the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the coal miner. 30 U.S.C. § 801(a). Congress elsewhere explicitly directed that "the Act be construed liberally when improved health or safety to miners will result." Conf.Rep.No. 91–761, 91st Cong., 1st Sess. 1, *reprinted in* [1969] U.S.Code Cong. & Ad.News 2578, 2578. Most significantly, the intent of section 203(b)(3) was summarized by a Senate Report as follows:

> In order to insure that miners who are afflicted with pneumoconiosis suffer no loss in compensation, the committee has included a provision entitling a miner who is transferred to another job pursuant to this subsection to receive his old or new rate of pay, whichever is greater.

S.Rep.No.91–411, 91st Cong., 1st Sess. 49 (1969), *quoted in Higgins v. Marshall*, 584 F.2d at 1041–42 (Wright, C. J., dissenting). Loss was not restricted to potential loss immediately after transfer; the Senate emphasized without qualification that the miner was to suffer *no* loss of compensation.

During a period of six months after his transfer, Matala received the same wages he had previously received. A year later he was receiving $8.00 per day less than he would have received had he endured the risk of aggravating his industrially-imposed black lung condition by staying in his old position. Two new coal collective bargaining agreements have since been executed. The new contracts and future contracts responding to modern inflation accelerate his loss of pay. There is little doubt that coal miners suffering with black lung, now offered the choice of preserving their health only by transferring at the expense of their families will, for the most part, accept the dangers of their present positions to maintain an undiminished standard of living. Such a result is inconsistent with congressional passage of this remedial legislation.