**HARBOR GATEWAY COMMERCIAL PROPERTY OWNERS' ASSOCIATION, et al., Petitioners**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent**

**No. 97–1737.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1998.

Decided Feb. 19, 1999.

---

Albert M. Cohen argued the cause and filed the briefs for petitioners.

H. Michael Semler, Attorney, United States Department of Justice, argued the cause for respondent. With him on the brief was Lois J. Schiffer, Assistant Attorney General. Eric G. Hostetler, Attorney, entered an appearance.

H. Michael Semler, Attorney, United States Department of Justice, argued the cause for respondent. With him on the brief was Lois J. Schiffer, Assistant Attorney General. Eric G. Hostetler, Attorney, entered an appearance.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

Petitioners challenge the Environmental Protection Agency's 1997 listing of the "Del Amo" site in Los Angeles, California, on the National Priorities List ("NPL"), arguing, inter alia, that EPA's 1996 proposal to list the Del Amo site was invalid because EPA violated the Omnibus Consolidated Rescissions and Appropriations Act of 1996 by proposing the site for listing based on a letter from California's environmental agency rather than a written request from the Governor as required by the Act. Because we agree with petitioners that EPA did not obtain the required written authorization from the governor, we conclude that the proposal, and hence the listing, were invalid, and therefore do not reach petitioners' other arguments.

I.

The "Del Amo" site is located in Los Angeles, and was occupied by a complex of rubber plants from the 1940's through the 1960's. During that time, residues were disposed of in pits located at the southern end of the plant, and other wastes were deposited in a series of evaporation ponds adjacent to the pits. The pits and ponds are separated from the remainder of the property by a 200-foot Department of Water and Power right-of-way. In 1972, a real estate developer purchased the land, demolished the rubber plant, and began constructing an industrial park and office complexes on the land north of the right-of-way. Petitioners are current owners and/or occupiers of this land north of the right-of-way, over two hundred acres of which now comprise industrial park and office complexes, known collectively as Harbor Gateway Centers. Their property does not include the pit area.

Investigations of possible environmental hazards at the site have been going on for some time. In 1981, the California Department of Toxic Substances Control learned of the pits and ponds, and soon thereafter, the area occupied by the pits and ponds was listed on the state's Superfund list. In 1991, EPA proposed that the "Del Amo Facility" be placed on the National Priorities List, a list of releases EPA determines present the greatest danger to public health or the environment. *See* Comprehensive Environmental Response, Compensation and Liability Act of 1980, § 105, 42 U.S.C. § 9605. EPA did not list the area based on this initial 1991 proposal. In 1993, EPA proposed to change the name of the "Del Amo Facility" to the "Del Amo Pits" to more accurately reflect the site, 58 Fed.Reg. 27,507, 27,511, but no final action was taken.

In 1996, EPA proposed to add the area to the National Priorities List as the "Del Amo" site. The proposal did not specify whether the site would include the pit and pond area only, or areas north of the right-of-way as well, and noted that "the listing process itself is not intended to define or reflect the boundaries" of any release. 61 Fed.Reg. 30,575, 30,576. The listing proposal was based on the site's score under EPA's "Hazard Ranking System," a model which is utilized for ranking sites for possible listing on the NPL. 40 C.F.R. pt. 300, app. A. The Hazard Ranking System regulations allow EPA to evaluate up to four separate exposure pathways for each site (groundwater, soil, surface water, air). *Id.* at § 2.1. The Del Amo site's score was based on the threat chemicals including benzene and hydrogen sulfide posed for the groundwater migration pathway. Comments objected to the use of hydrogen sulfide in the scoring, arguing that it had never been considered a threat to the groundwater. Comments also objected to EPA's use of the "Del Amo" name rather than the more specific "Del Amo Pits," since EPA had indicated in 1993 that the latter name accurately reflected the site. Finally, comments argued that the proposal was invalid because the EPA had not received a written request from the Governor to propose the site as the then-in-force Appropriations Act required, but had instead acted upon a written request from the state environmental agency.

On September 25, 1997, EPA listed the Del Amo Site on the NPL. 62 Fed.Reg. 50,442. EPA defended its use of hydrogen sulfide in scoring the site, noting that the ranking was entirely consistent with the method described in the Hazard Ranking System. EPA declined to change the site name from "Del Amo" to "Del Amo Pits," noting that it did not have sufficient data to explicitly define the limits of the site at that time. EPA also defended its acting without a letter directly from the Governor, since it did have a letter "on behalf of the Wilson administration" from California's environmental agency. *See Support Document for the Revised National Priorities List Final Rule—September 1997.*

Petitioners challenge the 1997 listing on several of the grounds raised in the comments, including EPA's use of hydrogen sulfide in scoring the site, the use of the name "Del Amo" rather than the more limited "Del Amo Pits," and the failure to obtain a written request from California's governor before proposing the listing of the site. We find the third argument dispositive, and do not address the first two.

II.

The Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321–297 to 299 (1996) ("Appropriations Act"), included a section regarding funding to carry out the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). That section provided that

> none of the funds made available under this heading may be used by the Environmental Protection Agency to propose for listing or to list any additional facilities on the National Priorities List ... unless the Administrator receives a written request to propose for listing or to list a facility from the Governor of the State in which the facility is located, or unless legislation to reauthorize CERCLA is enacted.

110 Stat. 1321–298.

The provisions of the Appropriations Act were in force at the time EPA sought to

propose listing of the Del Amo site. Accordingly, EPA, in a letter of May 24, 1996, contacted the deputy director of the California Department of Toxic Substances Control (DTSC) and explained what the Appropriations Act required with regard to the proposal to list the Del Amo site. The letter from EPA explained that the Appropriations Act "contained very specific language that requires EPA to obtain a letter from the Governor requesting the listing, or that the Governor submit a letter delegating the authority to request placement of sites on the NPL to the appropriate State official." EPA included with its letter to DTSC examples of letters from other States, including both a letter from a governor requesting listing of a site, and a letter from a governor authorizing the state environmental agency to act on the governor's behalf. EPA's letter further noted that the deadline for the letter regarding Del Amo was May 28, 1996. In response, in a letter dated May 30, 1996, DTSC deputy director Paul D. Blais wrote that "[DTSC], on behalf of the Wilson Administration, concurs with your agency's proposal to list the Del Amo Superfund site on the National Priority [sic] List." EPA responded by letter dated May 31, 1996, acknowledging receipt of the deputy director's letter, and also "confirming our understanding that you, as the Deputy Director for the Site Mitigation Program, have the authority to request that EPA list sites on the NPL."

Petitioners argue that this exchange of letters between the EPA and Deputy Director Blais did not satisfy the requirements of the Appropriations Act. Petitioners contend, and we agree, that if the Act was not satisfied, the proposal was null and void. *Cf. National Treasury Employees Union v. Devine,* 733 F.2d 114, 119–20 (D.C.Cir.1984) (holding that where Congress enacted an appropriations rider specifying that funds could not be used to effectuate new rules, the Office of Personnel Management's implementation of recently promulgated rules was prohibited and the rules were rendered null and void). We further agree with petitioners that absent a valid proposal, the Administrative Procedure Act's requirements for notice of proposed rulemaking would not be satis-

fied, rendering the subsequent listing invalid. *See* 5 U.S.C. § 553(b).

EPA has not argued that the listing can stand if the proposal was invalid. However, EPA claims that the letter from Deputy Director Blais satisfied the requirements of the Appropriations Act, so that the proposal was entirely proper. EPA argues that finding the exchange of letters between EPA and Blais to be inadequate would elevate form over substance, and frustrate the intention of the affected state. Furthermore, EPA urges that overturning the proposal on this ground could result in an expensive and time-consuming reproposal.

In contrast to its current arguments, EPA's actions leading up to the proposal demonstrate that it did understand the Act as requiring at least some type of letter from the Governor himself. EPA's May 24 letter to DTSC explained that EPA needed a letter from California's Governor requesting that the Del Amo site be proposed for listing, or alternatively, a letter from the governor delegating his authority to make such a request to another state official. We need not decide whether the alternative "letter of delegation" EPA proposed would have satisfied the Appropriations Act, as no such letter was sent. The letter of May 30, from Deputy Director Blais, was rather clearly of neither of the types EPA had requested. Nonetheless, EPA proceeded to act on the basis of that letter, albeit after the exercise of responding to "confirm" that Blais had authority to request listing. The fact that Blais's letter was at the very least not what EPA normally sought is further reflected in the notice of proposed rulemaking for Del Amo. 61 Fed. Reg. 30,575 (June 17, 1996). That notice included a section entitled "Governor's Concurrence," which noted that EPA had received "letters from the appropriate governors" regarding each site proposed, with the exception of the Del Amo facility. The notice went on to state that EPA received a letter for the Del Amo site "from the State environmental agency with prior verbal agreement from the Governor of California." *Id.* at 30,578. The fact that EPA sought and obtained a governor's letter regarding the other sites whose listing was proposed suggests

that agency officials may not have viewed the letter they received from Blais as so clearly satisfying the Appropriations Act as their litigation position suggests.

 Whether or not EPA officials actually considered themselves to be in compliance with the Appropriations Act, we do not. It may well be the case that our holding will result in additional expense if EPA decides to again propose the Del Amo site for listing, but that expense is the cost of complying with the law. *Cf. Garcia v. NLRB,* 785 F.2d 807, 812 (9th Cir.1986) ("[T]he rule of law requires, at an irreducible minimum, that all citizens obey the law regardless of economic cost."). We refuse to ignore the plain language of the Act in order to avoid potential costs which would not have arisen had EPA complied with the statute's language in the first instance. Indeed, when a statute's meaning is clear, and the enactment is within the constitutional authority of Congress, the "sole function of the courts is to enforce it according to its terms." *Higgins v. Marshall,* 584 F.2d 1035, 1038 (D.C.Cir.1978) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). In this case, the terms of the statute are clear. The Act explicitly requires "a written request ... from the Governor of the State," and we decline to treat this language as being satisfied by a letter from a deputy director of the state's environmental agency simply because the letter purports to be on behalf of the administration.[1]

EPA suggests that Congress really only sought the approval of the state, and that the state here clearly approved of the listing, so that reading the Act literally needlessly frustrates the state's intention. We find this argument unconvincing. As petitioners correctly note, other portions of the Appropriations Act authorize action based on requests from state officials other than the governor. *See* Pub.L. No. 104–134, 110 Stat. 1321–299 (1996) (authorizing certain grants to states "at the request of the Governor or other appropriate State official ..."). We see no

reason to depart from the usual canon that when Congress uses different language in different sections of a statute, it does so intentionally. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *International Union, UMWA v. MSHA,* 823 F.2d 608, 617–18 (D.C.Cir.1987). Furthermore, unlike EPA, we are unwilling to hypothesize a "substance" of the Appropriations Act removed from its "form" when the text is so explicit. Speculation about whether Congress actually intended to require written authorization from the Governor or merely to ensure some other form of state authorization is inappropriate where the statute's "commonly accepted meaning" is clear and there is no "reason to mistrust the common sense understanding of the statutory language." *Lubrizol Corp. v. EPA,* 562 F.2d 807, 818 (D.C.Cir.1977). *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 198–99 n. 25, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *United States v. Gonzales,* 520 U.S. 1, 117 S.Ct. 1032, 1036, 137 L.Ed.2d 132 (1997) (quoting *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95–96, 5 L.Ed. 37 (1820) (Marshall, C.J.) ("Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words ... in search of an intention which the words themselves did not suggest.")).

In this case, we see no reason to be at all skeptical that Congress meant what it said. It is perfectly reasonable for Congress to make a deliberate choice to require the attention of the Governor rather than another state official. When the Appropriations Act was passed, the reenactment of CERCLA was uncertain, and Congress accordingly sought to limit new listings and proposals for listing. *See* 110 Stat. 1321–298 (permitting use of funds for additional listing based on written request from governor *or* legislation to reauthorize CERCLA). Congress could well have viewed requiring a written request

---

1. Our dissenting colleague would find that the words "from the Governor of the State" encompass the concept of being "from" someone other than the governor. To expand her example, she would find that the phrase "memo from the

manager" could mean a memo from either the manager or from someone else who purported to represent the manager. We do not follow her reasoning. Dissent at 608, n.2.

from the governor of the affected state as a more significant limitation on new proposals and listings than simply requiring authorization from a lower-level state official. Indeed, a site whose listing merits the attention and approval of the governor may be more clearly a true priority of the state than a site known only to the state's single-mission environmental agency. We have previously observed with reference to the federal government that "single mission agencies do not always have the answers for complex regulatory problems." *Sierra Club v. Costle,* 657 F.2d 298, 406 (D.C.Cir.1981). Thus, the constitutional authority of the Chief Executive serves the practical purpose of ensuring "a careful weighing" of the broader implications of concern to the unitary executive. *Id.* The explicit language of the Act evidences a congressional decision that the same is true of the states. This is hardly an absurd conclusion that would drive us to seek an intent at odds with the statute's plain language. We therefore refuse to join EPA in its assumption that Congress was not concerned with whether the authorization came directly from the governor. Instead, we enforce the statute according to its terms—terms which require a written authorization from the governor which EPA failed to obtain in this case.

### Conclusion

We conclude that the proposal for listing the "Del Amo" site on the NPL failed to comply with the Omnibus Consolidated Rescissions and Appropriations Act of 1996. Accordingly, the proposal was null and void, and the subsequent listing of the site was necessarily invalid.

WALD, Circuit Judge, dissenting:

My colleagues invalidate the listing of the Del Amo site—the result of a 15-year inves-

tigation and proceeding—on the sole ground that there was no "written request" for such listing "from the Governor" as required by the relevant Appropriations Act. In truth the Deputy Director of the California Department of Toxic Substances Control wrote to EPA reporting that the DTSC "on behalf of the Wilson Administration concurs with ... [the] proposal to list" the site and later EPA reported in the Federal Register that it had received a letter from the State environmental agency "with prior verbal agreement from the Governor of California." No one has disputed the accuracy of those statements.

Thus we are confronted with the issue of whether a letter from the relevant agency stating that it had obtained the concurrence of the Governor to a proposal for listing suffices to meet the statutory command that there be a "written request" "from the Governor." Agreeing with my colleagues that agencies do not have discretion to ignore statutory commands, I would nonetheless find EPA to be in compliance here. The written request part is satisfied beyond doubt, and the request contains an undisputed statement that it is made with the concurrence of the Governor's administration. (This is validated by the later explanation in the Federal Register that the Governor's concurrence had been verbal.) Under such circumstances I would conclude that the request is "from the Governor." The statute nowhere commands that the request be personally signed by him.

The purpose of this statutory requirement has surely been met. No one in the 15 years of this controversy has pointed to any harm to any party or the statutory goal that has ensued from this form of compliance.[1] And the significant costs of going back to square

---

1. Moreover, even assuming there were some technical error here, section 706 of the Administrative Procedure Act provides that a court in reviewing agency action must take "due account ... of the rule of prejudicial error." Applied to this case, the rule of prejudicial error presumably means that petitioners must show that they were prejudiced by the EPA's failure to procure a letter written by the hand of the Governor of California. *See, e.g., Doolin Sav. Bank v. Office of Thrift Supervision,* 139 F.3d 203, 212 (D.C.Cir. 1998); *All Indian Pueblo Council v. United*

*States,* 975 F.2d 1437, 1443 (10th Cir.1992) (agency's failure to grant an administrative appeal not prejudicial when district court could resolve the same legal issues and remand to agency would be "an exercise in futility"). We have no reason to suspect, based on the letter from DTSC and the EPA's representation in the Federal Register of the Governor's oral agreement, that the Governor would have acted in a contrary way if the demand for a signed letter had been pressed.

608

one, while in no way would they excuse ignoring the requirement, at least suggest careful consideration as to whether it has been in fact violated.

Surely it would have been far preferable for EPA to have insisted on obtaining a direct communication written by the Governor as it did in the case of the other states. But in these circumstances, we have the functional equivalent, and I think the statute can reasonably bear the meaning given it here.[2]

2. "From" is "used as a function word to indicate the source or original moving force of something." *Webster's Third Int'l Dictionary* 913 (1976). In every day parlance, when a person asks, "Who is this memo from?" and the memo was written and signed by a subordinate "on behalf of" the manager, the correct answer is not necessarily "it is from a subordinate," but rather "it is from the manager." In the majority's view, however, the correct answer could *only* be "the subordinate" unless the manager had personally dictated the memo. This does not comport with common understanding.