**AMERICAN TELEPHONE AND TELEGRAPH COMPANY,**

and

**Lucent Technologies Inc.,**
Plaintiffs–Appellants,

v.

**UNITED STATES, Defendant/Cross–Appellant.**

Nos. 95–5153, 95–5154.

United States Court of Appeals,
Federal Circuit.

May 26, 1999.

C. Stanley Dees, McKenna & Cueno, L.L.P., of Washington, DC, argued for plaintiffs-appellants. With him on the brief was J. Keith Burt. Of counsel on the brief were Thomas R. Suher, and Dean L. Grayson, Lucent Technologies, Inc., of Washington, DC.

Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellants. With him on the brief was David M. Cohen, Director. Of counsel on the brief were Robert D. Hogue, James H. Haag, Attorneys, Office of General Counsel, Department of the Navy, of Arlington, Virginia.

Caryl A. Potter, III, Sonnenschein Nath & Rosenthal, of Washington, DC, for amicus curiae Electronic Industries Alliance and Aerospace Industries Association of America, Inc. With him on the brief were Elizabeth A. Ferrell, of Washington, DC; Alan M. Posner, of Chicago, Illinois; and Roger K. Heidenreich, of St. Louis, Missouri.

John Lloyd Rice, Miller & Chevalier, Chartered, of Washington, DC, for amicus curiae Federal Circuit Bar Association. With him on the brief was Clarence T. Kipps, Jr. Of counsel on the brief were L. James D'Agostino, Reed Smith Shaw & McClay, of McLean, Virginia; and George Hutchinson, Executive Director, Federal Circuit Bar Association, of Washington, DC.

Before MAYER, Chief Judge, NEWMAN, PLAGER, LOURIE, CLEVENGER, RADER, SCHALL, BRYSON, and GAJARSA, Circuit Judges.*

* Circuit Judges Rich and Michel did not partic- ipate in this decision.

Opinion for the court filed by Circuit Judge NEWMAN, in which Circuit Judges CLEVENGER, SCHALL, BRYSON, and GAJARSA join. Opinion concurring in result filed by Circuit Judge RADER, in which Chief Judge MAYER and Circuit Judge LOURIE join. Opinion dissenting-in-part and concurring-in-part filed by Circuit Judge PLAGER.

NEWMAN, Circuit Judge.

We took this appeal and cross-appeal en banc to reconsider the questions of law presented, upon certification for interlocutory appeal, concerning the applicability of § 8118 of the Defense Appropriations Act of 1987 to a contract between the Department of the Navy and the American Telephone and Telegraph Company. The Court of Federal Claims ruled that in view of the failure of the Department of Defense to comply with § 8118, the contract, which had been performed, was void ab initio. We now hold that the contract was not void, and remand to the Court of Federal Claims for further proceedings in accordance with this premise.

***The Reduced Diameter Array Contract***

This contract arose in Cold War response to the new ultra-quiet Soviet submarines, which were difficult to monitor using available technology and equipment. Effective antisubmarine response requires that hostile submarines be reliably detected, classified, located, and tracked. The Navy, among its programs for this purpose, employed an integrated undersea acoustic sonar system called the Surveillance Towed–Array Sensor System (SURTASS). In SURTASS a suitably equipped surface vessel tows an array of undersea detection equipment through the ocean, while the equipment collects and transmits appropriate data for processing on shipboard and for transmission to shore-based facilities. The President's *Annual Report*

*to the Congress* for fiscal 1987, on the topic of Antisubmarine Warfare Forces, referred to SURTASS as "[o]ne of our most important ongoing programs in this area." *Id.* at 188.

On December 31, 1987, after competitive bidding, the Navy awarded AT & T a fixed price incentive fee contract for a subsystem of SURTASS, referred to as the Reduced Diameter Array. The contract was a "Total Package Procurement," requiring design of shipboard and shore-based electronics, ship-winch interface and tow cable, and an acoustic and electronic array some 8,000 feet long, to meet the new Soviet submarine capabilities. The contract required research, development, and the delivery and testing of an engineering development model, at a fixed ceiling price of $19,221,630, and included an option to the Navy to acquire a second engineering development model at a fixed ceiling price of $3,510,253, and an additional option to acquire three production-level models at a fixed ceiling price of $8,475,466.

The contract was successfully performed by AT & T over a period of five years. With the price adjustments to which the Navy agreed during performance, the final fixed price was approximately $34.5 million. AT & T states that technical problems and unknowns arose throughout performance, and that its total cost was at least $91 million. The Navy rejected AT & T's requests for restructuring the contract and other relief, although AT & T directed attention to § 8118 of the Defense Appropriations Act and relevant Department of Defense policy directives concerning procurement of research and development for new technologies.

AT & T duly brought suit in the Court of Federal Claims under the Contract Dis-

putes Act. On cross motions for summary judgment the issues arising from the enactment of § 8118 were presented and argued. The Court of Federal Claims ruled that § 8118 applied to this contract, that it had not been complied with by the Department of Defense, and that the contract consequently was void ab initio. Responding to AT & T's proposal that the appropriate remedy was to reform the contract into the cost-reimbursement form favored by § 8118, the Court of Federal Claims held that since there had never been a valid contract it could not be reformed. The court held, however, that AT & T was entitled to compensation for its work on the basis of quantum meruit, on a theory of implied-in-fact contract. Before proceeding to determine quantum, the court certified for interlocutory appeal, in accordance with 28 U.S.C. § 1292(d)(2), the following questions:

(i) whether a contract executed in violation of statutory restrictions on the obligation and expenditure of appropriated funds may be declared void from the start at the instance of the performing contractor, and, if so,

(ii) whether compensation for benefits conferred upon the Government (pursuant to the voided contract) can be predicated on an implied-in-fact contract with the amount of recovery to be determined pursuant to unjust enrichment principles.

A panel of the Federal Circuit, by split decision, affirmed the ruling that the contract was void ab initio. The court also held that no relief was available to AT & T on any theory, except perhaps to replevin the goods that had been delivered to the Navy. Upon the petitions of both sides we have reheard the matter en banc.[1]

### Section 8118 of the Defense Appropriations Act of 1987

Concern about the use of fixed price contracts for research and development

---

**1.** The panel decision of the Federal Circuit, reported at *American Tel. & Tel. Co. v. United States,* 124 F.3d 1471 (Fed.Cir.1997), was vacated and withdrawn, 136 F.3d 793 (Fed.Cir.

1998). The decision of the Court of Federal Claims is reported at 32 Fed.Cl. 672 (1995), and the certification for interlocutory appeal is reported at 33 Fed.Cl. 540 (1995). On this

phases pervades defense procurement. In 1971 Department of Defense Directive (DODD) 5000.1 stated that "[i]t is not possible to determine the precise production cost of a new complex defense system before it is developed," and established the policy of using cost-reimbursement price terms for procurement of research and development. The Directive ˙stated: "Fixed price contracts are normally not appropriate for research and development phases." DODD 5000.1 & D.9.g (as amended, Sept. 1, 1987). The Federal Acquisitions Regulations governing R & D contracts also embodied this policy. *See, e.g.,* 48 C.F.R. § 35.006(c) (1984–1998) ("Because the absence of precise specifications and difficulties in estimating costs with accuracy (resulting in a lack of confidence in cost estimates) normally precludes using fixed-price contracting for R & D, the use of cost-reimbursement contracts is usually appropriate.")

The record states that in the 1980s, despite these policy directives, the Navy returned to fixed price contracting for R & D as part of the Total Package Procurement concept. This in turn led to congressional investigations and hearings. An investigation conducted by the House Appropriations Committee concluded that for the development phases of new technologies, the Navy's use of fixed price contracting resulted in program delays, cost overruns, contractor claims, non-participation, and litigation. *See Surveys & Investigations Staff, Report to the Comm. on Appropriations, U.S. House of Representatives: Navy Fixed Price Contracting in the Research, Development, Test and Evaluation (RDT & E) Account,* 100th Cong., 1st Sess. (1987). The Report stated that: "Although Navy officials at the headquarters level have predicted immense success for the acquisition policy, the opinions expressed by Navy and other Service field procurement officials and technical experts indicated that [fixed price contracting] generally [has] proved unsuitable in an R & D environment." *Id.* at ii. The Report concluded that the nature of the work in research and exploratory development contracting "most frequently necessitates" use of the cost-reimbursement type contract. *Id.* at 11.

At ensuing hearings on the 1988 Defense budget, concern was expressed about the continuing use of fixed price contracts for high-cost, high-risk development projects, as well as concern for meeting congressional oversight and allocation obligations under this form of procurement. *Department of Defense Appropriations for 1988: Hearings Before the Defense Subcomm. of the Comm. on Appropriations,* 100th Cong., 454–55 (1987). Legislatively implementing these concerns, the House included in the Defense Appropriations Act of 1987 the provision that became § 8118:

§ 8118. None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,-000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties: Provided, That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Under Secretary of Defense: Provided further, That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly ba-

---

rehearing *amicus* briefs were filed by the Federal Circuit Bar Association and by the Electronic Industries Alliance and Aerospace Industries Association of America.

sis, the contracts which have obligated funds under such a fixed price-type developmental contract.

Pub.L. No. 100–202, § 8118, 101 Stat. 1329, 1329–84 (Dec. 22, 1987). The accompanying Conference Report reiterated congressional concern that the risks of failure and of cost uncertainties be allocated equitably between government and contractor, and stressed the desire to "maintain the government's credibility as a reliable business partner." H.R. Conf. Rep. No. 100–498 at 623 (Dec. 22, 1987). Congress referred to the burden of a fixed price contract on the contractor when the miscalculation of development cost may have been that of the government agency as well as the contractor, and to the reluctance of some highly qualified firms to enter into such contracts. The Conference Report was unambiguous: "Fixed price contracts are normally not appropriate for research and development phases." *Id.* at 624. Thus Congress acted to adjust the risks of developing the advanced technologies needed in the service of national defense.

### Application of Section 8118

■ Section 8118 prohibited the award of certain fixed price-type contracts unless the program risk was evaluated at a high level within the Defense Department, and required quarterly reports of such awards to the House and Senate Appropriations Committees. The government argues first that '8118 did not apply to the Reduced Diameter Array contract, thus eliminating any need for the Navy to have complied with the statute. The Court of Federal Claims correctly held otherwise.

Section 8118 by its terms applies to "fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem." The government argues that the Reduced Diameter Array is not a "major system," referring to a memorandum issued six weeks after enactment of § 8118 wherein the Under Secre-

tary of Defense defined "major system" for the purposes of § 8118 as a system having a contract cost of over $75,000,000. In a *Memorandum for Service Acquisition Executives, Directors of the Defense Agencies* issued February 11, 1988, Under Secretary of Defense for Acquisition Costello instructed that "[t]he definition of major system at 10 U.S.C. § 2302(5) is the definition of that term for the purpose of [§ 8118]." This content was incorporated into SECNAV Instruction 4210.6A (April 13, 1988).

■ Section 2302(5) is a provision of chapter 137 of Subtitle A—General Military Law, which as then written defined "major system" as a system costing more than $75,000,000 for research, development, test, and evaluation:

**10 U.S.C. § 2302(5).** The term "major system" means a combination of elements that will function together to produce the capabilities required to fulfill a mission need. The elements may include hardware, equipment, software or any combination thereof, but excludes construction or other improvements to real property. A system shall be considered a major system if (A) the Department of Defense is responsible for the system and the total expenditures for research, development, test, and evaluation for the system are estimated to be more than $75,000,000 (based on fiscal year 1980 constant dollars) or the eventual total expenditure for procurement of more than $300,000,000 (based on fiscal year 1980 constant dollars)....

The government argues that the agency had discretion to define the § 8118 "major system" in accordance with '2302(5), and thereby to place a $75,000,000 floor on the systems to which § 8118 would apply. However, it was not within the agency's discretion to rewrite § 8118 to replace the statutory threshold of $10,000,000 with that of $75,000,000. Although an agency's

interpretation of a statute it administers is indeed entitled to deference, agency discretion does not extend to changing a clearly stated dollar figure. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("if the intent of Congress is clear, that is the end of the matter").

In addition, the AT & T contract itself, and the Space and Naval Warfare Systems *Command's* guide to the SURTASS, described the Reduced Diameter Array as a "subsystem." Subsystems were not defined in § 2305(5) and were not mentioned in the Memorandum of the Under Secretary. However, subsystems costing more than $10,000,000 were explicitly included in § 8118. Although the government now argues that the Under Secretary's Memorandum and SECNAV Instr. 4210.6A really covered a major system *or* a subsystem of a major system, this interpretation is contrary to the plain text of these documents. It is apparent that the Memorandum was contrary to the statute, and in all events that it did not include subsystems such as the Reduced Diameter Array.

The government also argues that not all of the funds expended under the Reduced Diameter Array contract were appropriated in the corresponding Appropriations Act, and thus that the § 8118 prohibition on obligating or expending funds does not apply. Indeed, the contract was structured for multi-year incremental funding. However, it is undisputed that the starting research and development effort drew on several millions of dollars of appropriated funds. The multi-year funding does not excuse the Defense Department from compliance with § 8118.

Moreover, contrary to the government's argument, which is made but not strongly pressed, this case does not involve a funding deficiency or implicate the Anti–Deficiency Act, 31 U.S.C. § 1341. *See Hercu-*

*les Inc. v. United States,* 516 U.S. 417, 427, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) ("The Anti–Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation."); *see generally Ferris v. United States,* 27 Ct.Cl. 542, 546 (1892) ("An appropriation *per se* merely imposes limitations upon the Government's own agents ... its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.") There is no issue in this case of lack of appropriated funds.

We affirm the determination of the Court of Federal Claims that § 8118 applies to this contract. The government does not dispute that the requirements of § 8118 were not met by the Department of Defense. There is no assertion that the Under Secretary of Defense for Acquisitions made or had made the program risk and pricing determinations required by § 8118, and no report of this contract is stated to have been made to the Senate and House Appropriations Committees. Although the government stresses that the contract was awarded only nine days after the enactment of § 8118, this does not excuse the failure of all compliance.

### Consequences of Agency Noncompliance With § 8118

■ We turn to the certified question of the consequences of this failure of compliance by the Department of Defense. AT & T states that § 8118 was enacted at least in part for its protection, and that the agency, by failing to obey the law, can not deprive AT & T of the protection of the law. AT & T argues that § 8118 is a "mandatory statute" restricting the agency's authority to obligate and expend funds, and that the Navy's direct contravention of § 8118 rendered the Reduced Diameter Array contract void *ab initio*.

The government responds that Congress chose and intended to enforce § 8118

through its oversight powers, and that AT & T can not benefit from whatever lapses may have occurred within the Department of Defense in its compliance with congressional oversight legislation. The government stresses that § 8118 did not provide that these fixed price contracts were prohibited, but only that the Defense Department must review the risk and its allocation at a specified executive level, and must report to Congress on a quarterly basis.

■ Legislative intent and precedent both lead to the conclusion that the AT & T contract was not void *ab initio* as a consequence of the agency's noncompliance. Invalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States. In *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) the Court explained that when a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions]" the court shall inquire "whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute]." *Id.* at 563, 81 S.Ct. 294. Thus the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity.

The policy embodied in § 8118 is elucidated in the congressional response when § 8118 did not receive full compliance from the Department of Defense. *See Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 572 F.2d 727, 733 (1978) ("illegality may be proved with reference to legislative history"). Congress simply tightened the reporting provision, by moving from after-the-fact quarterly reports to before-award reports. Indeed, the House version of § 8118 had initially required before-award reports, but this was dropped in Conference in favor of the Senate version "to reduce the appearance of congressional micromanagement." H.R. Conf. Rep. No. 100–498 at 623 (Dec. 22, 1987).

The Conference Report stated that if Defense Department policy did not become more uniform, "more severe restrictions" would be imposed. *Id.* This remark carries no hint of, and indeed belies, an interpretation that § 8118 was intended, upon enactment, to invalidate any contract made without meeting its internal review and reporting requirements, for such a "restriction" would already be extremely "severe." The statutory shift to before-award reports in succeeding years would be a trivial discipline indeed, if meanwhile all of the fixed price contracts within the statutory scope, although in the process of performance, or as in this case fully performed, were void *ab initio*.

Only a few months after enactment of § 8118 the House Appropriations Committee reported that the "enforcement of existing policy in this area has not yet been demonstrated," H.R.Rep. No. 100–681 at 147 (June 10, 1988), and recommended a pre-award reporting requirement (which was included in the enactment for the next fiscal year). The Senate Armed Services Committee, considering this renewal, stated explicitly that noncompliance was not intended to be "the basis for litigating the propriety of an otherwise valid contract":

> The committee recognizes that there are circumstances in which fixed-price development contracts are appropriate (e.g., when costs and foreseeable program risks can be reasonably anticipated), and the committee expects the Department to establish clear guidelines under this section for use of such contracts.

It is the intent of the committee that this section be applied in a manner that best serves the government's interests in the long term health of the defense industry, and that this section *not be used as the basis for litigating the propriety of an otherwise valid contract.* Nothing in this section shall be construed to affect the requirements of section 8118 of the Department of Defense Appropriations Act, 1988.

(Emphasis added.) S.Rep. No. 100–326, 100th Cong., 2d Sess. at 105 (May 4, 1988). This explicit statement of intent weighs heavily against judicial invalidation of "an otherwise valid contract," for the clearly stated congressional purpose is contrary.

These congressional responses, made with knowledge of the agency's imperfect compliance with § 8118, negate any reasonable inference that Congress intended simply to render void *ab initio,* even after full performance, any fixed price contract for which the Under Secretary's review of risk allocation and the report to the Committees were omitted. Congress can not have intended to charge the contracting partner with adverse consequences depending on whether the Defense Department carried out the internal responsibilities and filed the reports that Congress required.

Nor is it the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight. *See Longshore v. United States,* 77 F.3d 440, 443 (Fed.Cir. 1996) ("Congress has undoubted capacity to oversee the performance of Executive Branch agencies, consistent with its constitutional authority. It is not for this court to instruct Congress on how to oversee and manage its creations."); *E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367 (1978) ("The fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency [and not] by this court"); *cf. National Treasury Employees Union v. Campbell,* 654 F.2d 784, 794 (D.C.Cir.1981) (by statutory requirement that the Comptroller General report on certain expenditures "Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies.")

Both the DoD administration of § 8118, and the congressional response to this administration, make clear that Congress did not intend that this enactment would terminate fully performed contracts because of this flawed compliance.

■ Precedent reinforces our conclusion that the Reduced Diameter Array contract is not void *ab initio.* The invalidation of a contract after it has been fully performed is not favored. Precedent shows that those contracts that have been nullified, based on a failure to meet a statutory or regulatory requirement, are contracts that have not been substantially performed. *E.g., Alabama Rural Fire Ins. Co. v. United States,* 215 Ct.Cl. 442, 572 F.2d 727, 733–34 (1978). In *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367, 374–75 (1963), the court held a contract invalid, and refused to allow any recovery because no performance had occurred. It is not surprising that much of the litigation raising issues of violation of statute or regulation at the inception of government contracts has arisen in the bid protest context, where the asserted illegality has been explored before substantial performance has occurred. *E.g., CACI, Inc. v. Stone,* 990 F.2d 1233, 1235 (Fed.Cir.1993); *Schoenbrod v. United States,* 187 Ct.Cl. 627, 410 F.2d 400, 403–04 (1969). We take incidental note that the case at bar also involved a disappointed bidder raising post-award ob-

jections, and that none of the objections were based on § 8118.

In *Harbor Gateway Commercial Property Owners' Ass'n v. United States Environmental Protection Agency,* 167 F.3d 602 (D.C.Cir.1999), a case stressed in the dissenting opinion hereto, the court voided an EPA action because the Governor had not signed the request as the statute required. However, there was no issue of performance, or reliance, or any other contractual element. It is not before us to decide whether either party to the Reduced Diameter Array contract could have voided the contract early in its life and without penalty; the contract was performed for over five years, with no record suggestion from either party that because of § 8118 there was no contract.

Judicial reluctance to annul performed contracts when the government did not comply with a statutory or regulatory requirement was explained by the Court of Claims in *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 440 (1963), stating that "the court should ordinarily impose the binding stamp of nullity only when the illegality is plain." In *Reiner* the court recognized the "dilemma" of a contractor who becomes aware, while deep in the performance of a contract, of a possible procurement illegality he did not cause: the contractor must either continue to perform a contract of uncertain validity, or discontinue performance and risk severe penalties if a court later disagrees with his assessment of the illegality.

When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void ab initio. For example, in *LaBarge Products v. West,* 46 F.3d 1547, 1552–53 (Fed.Cir.1995) there was an illegal disclosure by the government during bidding; this court noted that the contract had been substantially performed and held that a valid contract existed despite the violation. In *Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1185–86 (Fed.Cir. 1988) the court allowed reformation of the contract price term to correct a regulatory violation, stating that "[t]he risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor." In *Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1154 (Fed.Cir.1983) the court held that a contract price term that was contrary to law did not invalidate the fully performed contract. In *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356, 1360 (1978) the court sustained a contract that was awarded after the contracting officer had negligently failed to meet a regulatory responsibility; the court held that the non-compliance with regulation was "a matter for internal resolution" and "did not render the resultant contract a nullity." In *Clark v. United States,* 95 U.S. 539, 542, 24 L.Ed. 518 (1877) the Court held a parol contract void for violation of the statute of frauds, but allowed recovery on an implied contract theory.

The entirety of precedent strongly supports our conclusion that the Reduced Diameter Array contract is not void *ab initio.* Precedent does not favor the invalidation, based on governmental non-compliance with internal review and reporting procedures, of a contract that has been fully performed by either contracting party.[2]

---

**2.** The dissenting opinion would hold the fully performed AT & T/Navy contract void *ab initio,* stating that the purpose of § 8118 was to "prevent contracts with the United States in contravention of its terms". However, Congress' stated concern was to curb the Navy's use of fixed price R & D contracting so as to "maintain the government's credibility as a

Although the parties discuss possible remedies, the issue of what relief may be available to AT & T is not before us, for the Court of Federal Claims did not consider AT & T's claims on the premise that the underlying contract was not void. We have not considered this issue, and express no view thereon.

**Answers to the Certified Questions**

For the reasons we have discussed, we conclude that the agency's failure to comply with the obligations of § 8118 did not render the Reduced Diameter Array contract void *ab initio*. Any failure by the Department of Defense in its internal compliance with § 8118 can not be invoked, particularly after full contract performance, either to strip the Navy of authority to have entered into the contract or to bar AT & T from presenting such claims, if any, that it may have.

The second certified question relates to remedy, but is based on the premise that the contract was void *ab initio*. Since that premise is incorrect, we do not reach the second certified question.

**Costs**

Each party shall bear its costs.

*QUESTIONS ANSWERED; CASE REMANDED.*

RADER, Circuit Judge, concurring in the result, in which MAYER, Chief Judge, and LOURIE, Circuit Judge, join.

Because § 8118 of the Defense Appropriations Act does not apply to this contract, I concur. Section 8118 provides in relevant part:

> None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed-price-

type contracts in excess of $10,000,000 for the ·development of a *major system* or subsystem . . . .

(emphasis added). This particular section of the U.S.Code does not supply a definition of "major system." However, § 2302(5) of title 10 of the United States Code, which relates to government procurement contracts generally, defines "major system:"

> The term "major system" means a combination of elements that will function together to produce the capabilities required to fulfill a mission need. . . . A system shall be considered a major system if (A) the Department of Defense is responsible for the system and the total expenditures for research, development, test and evaluation for the system are estimated to be more than $75,000,000 . . . or (C) the system is designated a "major system" by the head of the agency responsible for the system.

Therefore, the term "major system" refers to systems either with estimated costs above $75,000,000 *or* systems "designated a 'major system' by the head of the agency responsible for the system." *See* 10 U.S.C. § 2302(5) (1986). Shortly after enactment of § 8118, both the Department of Defense and the Navy incorporated this statutory definition into their interpretation of that section. As the agency charged with interpretation and application of the statute, the Department of Defense's reasonable interpretation of § 8118 deserves deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Department of Defense and Navy's interpretation alone gives meaning to all of the words in the statute. Both the Court

---

reliable business partner," H.R. Conf. Rep. No. 100–498 at 623 (Dec. 22, 1987), not to bar essential defense procurement. The dissent's proposed nullification of this fully performed contract would do little for "the government's credibility as a reliable business partner."

of Federal Claims' interpretation and this court's interpretation in this opinion would render the "major system or subsystem" language superfluous and would invoke § 8118 for any fixed-price contract in excess of $10,000,000. This court chooses that course on the reasoning that the agency's interpretation "rewrite[s] § 8118 to replace the statutory threshold of $10,000,000 with that of $75,000,000." This reasoning, however, discounts the statute's alternative method of categorizing a project as a "major system," namely, designation by the head of the agency. Thus, a project beneath the $75,000,000 threshold of 10 U.S.C. § 2302(5) could nonetheless qualify as a "major system" upon designation by the head of the agency.

This court's opinion discounts the reasonable reconciliations of the $10,000,000 contract amount requirement with the "major system" classification requirement. Under the agency's reasonable interpretation, the $10,000,000 contract amount requirement serves as a floor for invoking § 8118 in contracts involving a project designated as a "major system" by the department head. Furthermore, the $10,000,000 contract amount requirement does not lose its meaning for systems whose estimated costs exceed $75,000,000. Development of a major system typically requires multiple contracts with multiple developers. In these cases, the $10,000,000 requirement serves as a floor for application of § 8118 to each contract involved in the development of that "major system." Similarly, the $10,000,000 trigger amount excludes from § 8118 any subsystem contracts within a major system which do not satisfy this threshold amount. For these reasons, the $10,000,000 threshold continues to govern in conjunction with the $75,000,000 threshold for a "major system." In sum, these dual thresholds work together and provide a reasonable explanation for the agency's interpretation of these statutes. Because reasonable, the agency's interpretation deserves deference.

Even without deference to the Departments of Defense and Navy, their proposed interpretation of § 8118 alone gives meaning to all the statute's terms and should therefore govern this court's resolution. As noted above, this is the only interpretation which supplies meaning to all of the terms of the statute. Specifically, this is the only interpretation which gives meaning to the term "major system" as well as the $10,000,000 contract amount requirement.

Finally, I read the term "subsystem" in § 8118 as linked to "major system" by its context within the statute. Although neither 10 U.S.C. § 2302(5), nor the interpretations of § 8118 proffered by the Department of the Defense or the Navy address the definition of "subsystem," the statute itself ties the definition of this term to the term "major system." In essence, this interpretation would apply § 8118 to "major systems and subsystems of major systems." This reading preserves the statute's "major system or subsystem" requirement rather than expanding application of § 8118 to all fixed-price-type contracts exceeding $10,000,000.

Furthermore, to my eyes, this appeal does not present the question of whether this Reduced Diameter Array is a "subsystem" of a "major system." Although AT & T asserted below that the Reduced Diameter Array subsystem was a part of SUR-TASS, and that SURTASS was a major system according to the requirements of 10 U.S.C. § 2302(5), by consent of the parties before the Court of Federal Claims, that issue is not a subject of the certified appeal. For these reasons, I would not apply § 8118 to the Reduced Diameter Array contract at issue in this appeal.

PLAGER, Circuit Judge, dissenting-in-part and concurring-in-part.

I must respectfully dissent. The court refuses to honor an explicit mandate of an

unequivocal Congressional enactment. "Legislative history" cannot justify that refusal.[1] A court has a responsibility to arrive at the right result in a case; it also has the obligation to explain itself in a manner that does no harm to the fabric of the law. Though the right result may eventually emerge, the route the court takes to get there has the potential for causing considerable harm to legal principles that I deem important.

In the first part of its opinion, the court describes the Government's efforts over time to adjust the risks that are inherent in cutting-edge R & D contracts so that they are fair both to the Government and the contractor. *See* slip op. at 1369–70. These efforts begin at least in 1971 with DODD 5000.1, and culminate, for purposes of this case, with the enactment in 1987 of § 8118 as part of that year's Department of Defense ("DoD") Appropriations Act. *See id.* at 1370–72. As the court explains, § 8118 prohibited using Government funds for fixed price-type R & D contracts except under certain conditions.

The court then sets out the history of the R & D contract at issue in this case, and concludes, correctly, that Section 8118 applies to this DoD fixed price-type alleged contract. *See id.* at 1372–73. The court concludes, again correctly, that the exception provided in the statute, permitting a fixed price-type R & D contract under certain conditions, is not applicable since the DoD did not take the steps necessary to qualify for an exception. *See id.*

This is the same conclusion on the point reached by the Court of Federal Claims, which this court now affirms. The court rejects the Government's various arguments to the contrary, and finally concludes this part of its analysis with the statement that: "Although the government stresses that the contract was awarded only nine days after the enactment of § 8118, this does not excuse the failure of all compliance." *Id.*

Given that the court recognizes the language of the Act to expressly prohibit the use of Government funds for such a contract, the obvious and ineluctable conclusion would appear to be that there was no contract, since as a matter of law such contracts were prohibited, and since there could be no consideration offered for the contractor's promised performance. Remarkably, the court reaches exactly the opposite conclusion, and finds the contract valid, and presumably enforceable. For the reasons I shall explain, I cannot join the court in this.

### 1.

Omitting the inapplicable exception language and its related provisos, the operative words of the statute are clear and to the point: "**None of the funds provided for the [DoD] in this [Appropriations] Act may be obligated or expended for fixed price-type contracts . . . .**" It is a rule of constitutional law that, in absence of an express appropriation, agencies may not spend, and *a fortiori* cannot validly contract to spend, any federal dollars. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). The Supreme Court earlier reversed us when in another context we failed to properly apply that principle. *See Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

Here, we do not have simply an omission of authorization to expend; we have an outright prohibition: "**None** of the funds

---

1. A similar reaction was eloquently expressed by Chief Judge Joseph of the Oregon Court of Appeals in an award to his colleagues. *See Western Communications, Inc. v. Deschutes County,* 100 Or.App. 706, 788 P.2d 1013, 1017 (Or.App.1990) (Joseph, C.J., dissenting-in-part, concurring-in-part).

[otherwise appropriated] may be expended . . ." for the precise purpose for which the DoD contracted. Surely it should not be necessary for Congress to have added: "and we mean it," or perhaps, "and we mean it, and if you try, it won't be any good, so don't even bother."

It is not uncommon for Congress to put prohibitions such as that contained in § 8118 in Acts appropriating funds to executive branch agencies.[2] A recent case in point: Congress, in an Appropriations Act which included the U.S. Environmental Protection Agency,[3] specified that "none of the funds made available under this heading may be used by the Environmental Protection Agency . . . [for certain described activities affecting states] unless the Administrator receives a written request . . . from the Governor of the State. . . ." The EPA, on the basis of an authorizing letter from a state official, not the Governor, undertook such activity with regard to certain property in California. Affected interests appealed.

Judge Sentelle, writing for the Court of Appeals for the District of Columbia Circuit, found that the state official's letter did not meet the terms of the statute, and readily concluded that, in the absence of a letter from the Governor himself, the EPA action was "null and void," and "was necessarily invalid." *Harbor Gateway Commercial Property Owners' Ass'n v. United States Envtl. Protection Agency,* 167 F.3d 602, 607 (D.C.Cir.1999).[4]

In response to the Government's argument that EPA officials considered them-selves to be in compliance, and in any event an invalidation of the action would require that the action be done again and would just cost the Government more money, the District of Columbia Circuit answered:

> We refuse to ignore the plain language of the Act in order to avoid potential costs which would not have arisen had EPA complied with the statute's language in the first instance. Indeed, *when a statute's meaning is clear, and the enactment is within the constitutional authority of Congress, the "sole function of the courts is to enforce it according to its terms."*

*Id.* at 606 (emphasis added). That seems to be the law on the subject; I know of no cases to the contrary, and the court here cites none.

In this case, AT & T, after due negotiation with the Navy, offered to make and sell to the Navy for an agreed fixed price a submarine-detecting piece of equipment. The Navy accepted the offer, and proposed to pay for the work using funds from the 1987 Appropriations Act that contained the express prohibition set out above. As the *Harbor Gateway* court explained, the Navy's action was "null and void," and "necessarily invalid."

Furthermore, the Navy's action in this case was taken for the purpose of entering into a contract. But the Navy was legally incapable of using Government funds unless it told Congress what it was up to in the manner required by the statute, which the Navy chose not to do. (It is difficult

---

**2.** *Cf. Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (construing the phrase "method of family planning" in an Act appropriating funds to the Department of Health and Human Services, subject to a proviso that stated: "None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.").

**3.** *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321–298.

**4.** Judge Wald dissented. She did not disagree with the court's understanding of the consequences of noncompliance with the statute, but dissented on the grounds that the state official's letter was "the functional equivalent" of a governor's letter. *See Harbor Gateway,* 167 F.3d at 607 (Wald, J., dissenting).

not to believe that both parties were fully aware of the statute and simply chose to ignore it, though that is of no moment to the issue before us.[5]) Thus, not only was the act of contracting prohibited by statute, but as a matter of basic contract law no legally-binding contract could be created: offer, acceptance, and consideration remain a fundamental requirement for a legally-binding contract, whether between private parties or between a private party and the Government. *See, e.g., Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed.Cir.1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). Here, the Government could neither offer or pay consideration; no consideration, no contract, end of discussion, at least with respect to contract validity under basic contract principles.

### 2.

I cannot agree with the court that the "purpose" of the statute overrides its express terms. The court tells us that this statute "must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." Slip op. at 1374. Clearly, however, the purpose of this statute, expressed in no uncertain language, is exactly the opposite—it is intended to *prevent* contracts with the United States in contravention of its terms, not to support them.

It has been some years since a court-invented "purpose" so blatantly repealed a Congressional enactment. Last century, in *Rector, etc. of Holy Trinity Church v. United States*, 143 U.S. 457, 471, 12 S.Ct. 511, 36 L.Ed. 226 (1892), the Supreme Court announced that this is a "Christian nation," and on that basis concluded that

the purpose of a statute that banned immigration of foreign workers could not possibly be to prevent an English clergyman from coming to work in the United States. In this century, and certainly in recent times, purpose-inventing by judges has received the opprobrium it deserves when used as an excuse for ignoring the law.

Professor Dickerson, one of the early writers on statutory interpretation, described the process of purpose-inventing as if he had this case in mind:

> As with legislative intent, the danger in presuming an actual legislative purpose beyond what is expressly or impliedly revealed is that the interpreter will either attribute to the statute a purpose of his own contriving or search for actual purpose so relentlessly that he goes beyond the limits of the appropriate available evidence.

Reed Dickerson, *The Interpretation and Application of Statutes* 92 (1975).

Writing more formally for the Court a half-century ago, Justice Jackson said, "we take the Act as Congress gave it to us, without attempting to conform it to any notions of what Congress would have done if the circumstances of this case had been put before it." *Western Union Tel. Co. v. Lenroot*, 323 U.S. 490, 501, 65 S.Ct. 335, 89 L.Ed. 414 (1945). In the same vein, and more recently, the Supreme Court, Justice Scalia writing, said, "Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so, . . . ." *Brogan v. United States*, 522 U.S. 398, 118 S.Ct. 805, 811–12, 139 L.Ed.2d 830 (1998).

In support of its position, the court cites various pieces of what it describes as legislative history. However, a prerequisite to judicial use of legislative history, even relevant legislative history, is a finding that

---

**5.** As my colleagues know, I spent some years of my life as a sea-going officer in the U.S. Navy; it is not easy for me to be critical of the Service, but the facts are what they are.

the statute at issue is ambiguous. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (Justice Thomas, writing for a unanimous Court) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). To the court's credit here, the majority does not pretend to find in this unequivocal statute any ambiguity. Rather, it simply concludes that committee report language, nowhere addressed to the specific problem before us, trumps statutory clarity.[6]

The committee report language the court cites includes certain 1988 House and Senate reports. In the first place, this so-called legislative history is not history – that is, the House and Senate Reports the court cites with such authority (*see* maj. op. at 1374–75) were written *after* § 8118 was enacted in 1987, and relate to later-considered legislation. How the views of a later Congress, not contained in actual legislation, can be seen as amending or modifying prior legislative acts, is not explained. And, even assuming that any of that legislative history is relevant to understanding the 1987 Act, the only consistent thread in all of it is the expression of congressional irritation and frustration with the DoD's (or at least the Navy's)

stubborn insistence on doing what Congress wanted stopped.

Further, when examined, even the terms in which the language of the 1988 Senate Report was written, heavily relied upon by the court to support its conclusion, *see* maj. op. at 1375, fail to support the court's view. The Report states that "this section [not § 8118 of the 1987 Act, but a later-proposed section] not be used as the basis for litigating the propriety of an otherwise valid contract." S.Rep. No. 100–326, at 105 (1988). Since by its terms a contract in direct violation of § 8118 is not "otherwise valid," the statement proves nothing with regard to § 8118, whether it be the 1987 version or the proposed 1988 version. And in case a court should miss that point, the very next sentence in the Report is: "Nothing in this section shall be construed to affect the requirements of section 8118 of the Department of Defense Appropriations Act, 1988." *Id.*

3.

The court finds further justification for its emasculation of the statute by opining that "Congress can not have intended to charge the contracting partner with adverse consequences depending on whether the Defense Department carried out the internal responsibilities and filed the reports that Congress required." Slip op. at 1375. The response to that observation is that that would appear to be exactly what Congress intended. AT & T, one of the country's leading government contractors,[7] could be expected to be familiar with government contracting laws. It is difficult to imagine that AT & T was unaware of the battle between Congress and the DoD

---

**6.** The concurring opinion stays within established statutory interpretation principles by attempting to redefine the scope of § 8118. Unfortunately, for the reasons well-explicated in the opinion of the court majority, the attempt to have this contract escape the clutches of § 8118 fails.

**7.** For the year 1987, AT & T was listed as 15th among the Top 100 Federal Contractors, with 1,438 procurement actions worth something

over $2 billion. *See* Federal Procurement Data Center, Governmentwide Information Systems Division, MVS, GSA, Central Office, *Top 100 Federal Contractors* 14 (Jan. 25, 1988). AT & T was 16th in 1988. *See* Federal Procurement Data Center, Governmentwide Information Systems Division, MVS, GSA, Central Office, *Top 100 Federal Contractors* 14 (Feb. 2, 1989).

over these fixed price-type contracts. At the least, it is not irrational for Congress to have assumed that a contractor, like AT & T, proposing to undertake a major R & D contract would know who in the DoD to contact regarding the requirements for the contract they were negotiating, and that the DoD's lawyers would know the relevant law.

What the court seems to have in mind here, though it does not say so, is the rule, sometimes called the "Golden Rule," that a statute should not be understood to call for an absurd result. Just as finding a statute ambiguous permits a court to go beyond the terms of the statute in searching for meaning, the Golden Rule permits a court to go beyond the apparent meaning of a statute when its application would be absurd.

Justice Kennedy described the Rule thusly:

> Where the plain language of the statute would lead to "patently absurd consequences," that "Congress could not *possibly* have intended," we need not apply the language in such a fashion. . . . This exception remains a legitimate tool of the Judiciary, however, only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result, and where the alleged absurdity is so clear as to be obvious to most anyone.

*Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 470, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring). One must wonder whether a statute that orders the DoD not to spend money in a wasteful way is "absurd" within the definition set forth by Justice Kennedy.

Emphasizing the narrow scope of the absurdity exception, Justice Kennedy went on to note:

> Where it is clear that the unambiguous language of a statute embraces certain conduct, and it would not be patently absurd to apply the statute to such conduct, it does not foster a democratic exegesis for this Court to rummage through unauthoritative materials to consult the spirit of the legislation in order to discover an alternative interpretation of the statute with which the Court is more comfortable. . . . The problem with spirits is that they tend to reflect less the views of the world whence they come than the views of those who seek their advice.

*Id.* at 473, 109 S.Ct. 2558 (internal citations omitted) (Kennedy, J., concurring).[8]

4.

AT & T has no rightful claim to another penny of public money. It agreed to build and sell a product to the Government for a fixed price. It performed its end of the deal, and delivered the goods. The Government likewise performed its part of the deal; it paid AT & T the agreed-upon price (actually more, as a result of negotiated add-ons).

If the contract had been *valid* under governing law, AT & T would have no basis for claiming more money; our precedents are unequivocal that full payment

8. Justice Rehnquist expressed the same sentiment in *United Steelworkers of America v. Weber*, 443 U.S. 193, 254, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting) ("Finding the desired result hopelessly foreclosed by these conventional sources, the Court turns to a third source –the 'spirit' of the Act. But close examination of what the Court proffers as the spirit of the act reveals it as the spirit animating the present majority, not the 88th Congress.").

under a valid fixed price-type contract is all to which a contracting party is entitled.[9] The risk of loss for misjudging what it takes to perform, or for deliberately underbidding, is on the contractor, not the Government.[10]

AT & T now seeks to take advantage of the fact that the deal it made with the Government did not result in an enforceable contract, which it likely knew (and certainly should have known) when it proposed to enter into the agreement. AT & T demands more money for what it has been fully paid to do. The answer to that facially nonsensical demand is, in a word, "no."

Perhaps the court thought it could not get there if, in accordance with the statute, it held the contract invalid. Actually, the right answer is not that difficult, even accepting the fact that there is no legally-enforceable contract between the parties. AT & T argues that, since the contract it made is unenforceable, it should be treated as having an "implied-in-fact" contract, a key term of which would be different from that to which the parties actually agreed. The different term would be that the contract would not be for a fixed price, but instead would be a cost-plus contract. That would take the contract outside the

scope of § 8118, and give AT & T a rightful claim to all the money for which it asks.

That would also make nonsense out of the concept of an implied-in-fact contract. An implied-in-fact contract is a form of consensual contract, reflecting the basic requirements for such a contract including that of a meeting of the minds. It differs from the usual express contract only in that the terms, instead of being expressly stated by the parties, are derived from their conduct. Nothing here in the conduct of the parties suggests an agreement to have a cost-plus contract; on the contrary, the parties specifically stipulated to a fixed price-type contract.

If AT & T is to have any remedy entitling it to more than what it has been paid, its claim must be based on some sort of equitable claim for payment for goods sold and delivered, a *quantum valebat* claim.[11] Even assuming for discussion purposes that the Court of Federal Claims could exercise the powers of a court of equity, AT & T has no equity on its side, and therefore is not entitled to the intervention of a court of equity.

AT & T comes to the court with unclean hands. AT & T is not an innocent bystander being taken advantage of by a predator government. Both the Government and AT & T knew exactly what they

---

9. *See, e.g., Loral Corp. v. United States,* 193 Ct.Cl. 473, 434 F.2d 1328, 1330 (1970) ("[T]he type of contracts in question are firm fixed-price contracts and once the price was agreed upon, that price remains fixed and it is not subject to further negotiation, unless otherwise provided in the contract."); *see also* 48 C.F.R. § 16.202–1 ("A firm fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."); *cf. ITT Fed. Servs. Corp. v. Widnall,* 132 F.3d 1448, 1451 (Fed.Cir.1997) (holding that ITT was not entitled to recovery of normal severance costs because in a firm, fixed-price contract situation, the contractor assumes responsibility for all such costs that may be incurred).

10. *See, e.g., ITT,* 132 F.3d at 1451 (Fed.Cir. 1997) (agreeing with the ASBCA that in a

firm fixed-price contract situation, the contractor "assumes maximum risk and full responsibility for all such costs that may be incurred"); *see also* 48 C.F.R. § 16.202–1 (placing upon the contractor "maximum risk and full responsibility for all costs and resulting profit or loss"); *cf. Emerald Maintenance, Inc. v. United States,* 925 F.2d 1425, 1430 (Fed.Cir.1991) (noting that the risk of loss was on the contractor who "should not be compensated for incurring added expenses resulting from assuming that risk").

11. An action for goods sold and delivered, "founded on an implied *assumpsit* or promise, on the part of the defendant, to pay the plaintiff *as much as* the goods *were* reasonably *worth.*" *Black's Law Dictionary* 1244 (6th ed.1990).

were doing when they entered into this deal. It simply defies belief that AT & T was unaware of § 8118 when it purported to contract with the Government or was unaware that the Navy was proceeding with the contract in the manner the Navy did.

In any event, that does not matter. The most that AT & T would be entitled to under any equitable theory is the fair value of the goods sold, and that value was agreed to by AT & T when it made the deal with the Navy. The goods are one-of-a-kind, not to be found on the shelf at your usual military equipment supermarket. There can be no better method for determining a fair price for the goods than to see what a willing seller would sell them for to a willing buyer.

AT & T does not allege that it was coerced by the Government, or that it was caused to enter into the deal by fraud. It simply wants more money for a product it agreed to provide for a price that proved, according to AT & T, too low. An inefficient, wasteful, or simply ignorant contractor cannot foist off on the other contracting party the consequences of its own incompetence.[12] The law in a case like this leaves the parties where it found them.[13]

The en banc court appears unwilling to give AT & T any more money on its so-called non-contract claim. As I said at the beginning, a court has a responsibility to arrive at the right result, but also an obligation to do no harm to the fabric of the law. A wrong result is an injustice to one party; distorting important legal principles is a disservice to the entire legal system.

It is true that statutory interpretation does not occur in a vacuum. Words take meaning from the context in which they are used, and, when text and context yield genuine doubt, courts may seek guidance from accepted canons, from history, and from legislative purpose when it can be authoritatively known. In many cases, construing Congressionally-mandated language is as much an art as it is linguistic science. But it is not an art in which the picture that emerges is without constraints, or is limited only by the imagination of the artist.

There is an established methodology that courts employ in construing statutes. As the quoted excerpts from the Supreme Court show, the methodology is well-recognized, even if judges do not always agree on how much weight to give to its various parts in a given case.[14] The methodology is designed to provide guidance

**12.** It should be obvious that, just as AT & T could not claim additional payment for goods for which it has been fully paid, it could not claim ownership of the goods for purposes of recovering them, for example, in a replevin action. A suggestion to the contrary could not be taken seriously. Even if the law would contemplate it, it is hard to imagine a major American contractor, whose fiscal lifeblood comes in substantial measure from contracts with the United States Government, even thinking about replevying a secret government weapon for resale elsewhere. Money is one thing; fiscal suicide is another.

**13.** See, e.g., Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933) ("A court of equity acts only when and as conscience commands; and, if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatev-

er may be the rights he possesses, . . . he will be held remediless in a court of equity." (internal quotations omitted) (quoting *Deweese v. Reinhard*, 165 U.S. 386, 390, 17 S.Ct. 340, 41 L.Ed. 757 (1897))).

**14.** The methodology of statutory interpretation, with all its ramifications, has become one of the darlings of academic discourse, and is offered as a proper subject of study in many of the leading law schools, taught from modern-day casebooks. See, e.g., William D. Popkin, *Materials On Legislation: Political Language and the Political Process* (Found. Press 2d ed.1997); William Eskridge & Philip Frickey, *Cases and Materials on Legislation— Statutes and the Creation of Public Policy* (West Pub. Co.2d ed.1995); Abner Mikva & Eric Lane, *Legislative Process* (Little, Brown 1995).

for the exercise of judicial self-discipline, the self-discipline that produces principled decisions.

This court has in the past expressly recognized the governing principles: "A statute is by definition the law to be followed—not disregarded, effectively repealed, rewritten, or overruled (unless unconstitutional)—in the federal courts," *In re Mark Indus.*, 751 F.2d 1219, 1224 (Fed. Cir.1984), and recently reiterated the point: "This court is empowered to rewrite neither statutes nor regulations, however unwise, nor does it have the information base nor expertise to do so effectively," *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1558 (Fed.Cir. 1993).

In sum, since the statute before us is not ambiguous and its application to the case would not require an absurd result, there is neither reason nor justification for reaching beyond the statute to legislative history or supposed purpose in order to find a different answer. Further, what little known legislative history there is I find inapposite and unpersuasive. Accordingly, I believe it is our duty to apply the statute as it has been given to us by Congress.

Thus, my answers to the questions certified are: (1) yes, the contract is null, void, and necessarily invalid, as the Court of Federal Claims correctly concluded; and (2) no, AT & T is not entitled to any equitable or other remedy on the facts presented, even if the Court of Federal Claims had power to grant such a remedy. I respectfully dissent from the court's contrary view.